# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

SIDDIQUE ABDULLA HASAN,
 Formerly known as Carlos Sanders,

                    Petitioner,              :    Case No. 1:03-cv-288

    - vs -                                        District Judge Susan J. Dlott
                                                  Magistrate Judge Michael R. Merz
TODD ISHEE, Warden
                                             :
                    Respondent.

# DECISION AND ORDER

This capital habeas corpus case, arising out of the 1993 prison riot at Southern Ohio Correctional Facility (Lucasville), is before the Court on Petitioner Siddique Abdullah Hasan's Motion to Amend, for Additional Discovery, an Evidentiary Hearing, or to Stay and Abey Proceedings to Allow Exhaustion of Newly Discovered Claim.[1]  (ECF No.185.)  The Warden has responded (ECF No. 188), and Hasan has filed his Reply (ECF No. 172)(see footnote 1) and a Notice of Additional Authority (ECF No. 173).

The Motions at issue are all non-dispositive pre-trial motions committed in the first instance to the decisional authority of an assigned Magistrate Judge.

---

[1] The Magistrate Judge filed a Report and Recommendations recommending that Hasan's petition for a writ of habeas corpus be denied.  (ECF No. 81, *Hasan v. Ishee*, 2006 WL 3253081 (S.D. Ohio Aug. 14, 2006).)  After Hasan objected, a Supplemental Report and Recommendations followed, again recommending that Hasan's petition be denied.  (ECF No. 119, *Hasan v. Ishee*, 2010 WL 6764154 (S.D. Ohio Dec. 29, 2010).)  Also, Hasan originally filed the instant motion as ECF No. 166, but after extraordinarily voluminous additional discovery documentation was provided to the Court, the instant motion was filed incorporating updated citations to the referenced pages of that documentation.  Likewise, Respondent has followed his initial opposition to Hasan's motion as ECF No. 169 and an updated version, ECF No. 188, incorporating revised citations to the discovery material.

# PROCEDURAL HISTORY

## State Court Proceedings

Hasan's proceedings in the state courts were summarized in this Court's August 14, 2006, Report and Recommendations (ECF No. 81, PageID 1061-63), as follows:

### Direct Appeal

On April 22, 1997, Hasan filed his appellate brief in the Court of Appeals for Hamilton County, Ohio, advancing thirty assignments of error. Hasan's motion to strike the brief and appoint new counsel was denied by the court of appeals. A supplemental brief was filed by Hasan's counsel supplementing his fifth and eighth assignments of error and adding twelve new assignments of error on September 2, 1997, three days past the deadline set by the court of appeals. Moreover, Hasan was not provided with a copy of his trial transcript until September 18, 1997. None of Hasan's claims succeeded, and the court of appeals affirmed the trial court on May 1, 1998.

On September 15, 1998, Hasan filed his appellate brief in the Ohio Supreme Court claiming error in forty-four propositions of law. On January 5, 2000, lead counsel in Hasan's case, Chuck Stidham, was suspended from the practice of law for various ethical breaches committed in cases in which he was retained between 1994 and 1998, and for misrepresenting the nature and name of his law firm in violation of Ohio *Disciplinary Rules 2-102(B) and (C)*. *Cincinnati Bar Ass'n v. Stidham,* 87 Ohio St.3d 455, 721 N.E.2d 977 (2000). The Ohio Public Defender's Office was appointed to represent Hasan following Stidham's removal from the case, and a new briefing schedule was set.

On July 21, 2000, Hasan filed a superseding appellate brief advancing thirty-four propositions of law. The Supreme Court of Ohio rejected Hasan's claims of error, and affirmed the court of appeals on July 18, 2001. *State v. Sanders,* 92 Ohio St.3d 245, 750 N.E.2d 90 (2001). A subsequent motion to reconsider was

similarly rejected. On April 29, 2002, the United States Supreme Court denied Hasan's petition for a writ of certiorari.

**Post-conviction**

In the meantime, Hasan was also pursuing post-conviction relief in the state courts, filing his first petition for post-conviction relief in the Hamilton County Court of Common Pleas on July 23, 1997. The trial court denied each of Hasan's thirty-nine claims for relief and granted the State's motion to dismiss the petition on February 3, 1998. Hasan took an appeal to the Court of Appeals for Hamilton County, advancing twenty-five assignments of error. The court of appeals affirmed the dismissal, *State v. Sanders,* No. C-980154, 1999 WL 162146 (Ohio App. 1st Dist. Mar. 26, 1999), and no further appeal was taken in the Ohio Supreme Court.

A second petition for post-conviction relief was filed by Hasan on May 1, 2001, in which he alleged forty-two claims of error. On January 15, 2002, the trial court dismissed the second petition, concluding that Hasan had failed to satisfy the mandatory requirements of Ohio Rev. Code §§ 2953.23(A)(1) and (2). (Appendix, Vol. 6-C at 309.) Hasan's appeal was denied in the court of appeals, *State v. Sanders,* No. C020077, 2002 WL 31127540 (Ohio Ct.App. 1st Dist. Sept. 27, 2002), and the Ohio Supreme Court declined review, *State v. Sanders,* 98 Ohio St.3d 1423, 782 N.E.2d 78 (2003).

**Application to Reopen Direct Appeal**

Concurrent with his post-conviction proceedings, Hasan also pursued an Ohio R.App. Proc. 26(B) application to reopen his direct appeal on account of his appellate counsels' [sic] ineffectiveness, allegedly illustrated by their failure to raise as error twenty-four assignments of error. The court of appeals denied Hasan's application, and the Ohio Supreme Court affirmed and denied reconsideration.

**Habeas Corpus Proceedings**

On April 22, 2003, Hasan filed his Petition for a Writ of Habeas Corpus in this Court, raising thirty-five grounds for relief. (ECF No. 16.) Following Respondent's filing of the Return of Writ (ECF No. 17), Hasan moved for discovery and an evidentiary hearing (ECF No. 21). Oral arguments were held on the motion (ECF No. 36), which was subsequently granted in part

as to the discovery requested, and denied without prejudice to its renewal within a specified time as to the request for an evidentiary hearing[2] (ECF No. 37). Hasan filed objections (ECF No. 39), which the district judge overruled (ECF No. 46). Reconsideration was sought, granted, and Hasan's objections were overruled again (ECF Nos. 48, 53 and 57, respectively). Hasan later filed a second motion for reconsideration (ECF No. 79), which was denied as moot following this Court's issuance of its Report and Recommendations (See ECF No. 81 and Notation Order dated August 29, 2006).

Hasan filed a second motion for discovery in April 2006 (ECF No. 72), which was also denied (ECF No. 75) then appealed (ECF No. 76); restated, expanded, and subsumed in Hasan's Additional Briefing Per Court's December 18, 2006, Order (ECF No. 110) following filing of this Court's Report and Recommendations (ECF No. 81); and finally granted in part on November 17, 2011 (ECF No. 139).

Shortly thereafter, the parties filed a joint motion to consolidate Hasan's case with that of Jason Robb, another Lucasville case, for purposes of discovery management. (ECF No. 141.) Explaining that the discovery in both cases involves the same facts, recognizing that the discovery materials sought in Hasan's case were similar if not identical to those in the *Robb* case, and noting that a third Lucasville defendant, James Were, had successfully sought to intervene in *Robb* to gain access to the discovery materials in that case, the Court granted consolidation of Hasan's and Robb's cases for the limited purpose of discovery. (ECF No. 142.) Upon completion of the granted discovery, Hasan filed the first version of the instant motion (ECF No. 166), later refiling it as ECF No. 185.

Hasan asserts that his fourth, eighth, ninth, and tenth habeas corpus grounds for relief

---

[2] Hasan failed to renew his request for an evidentiary hearing within the allotted time, and the Court deemed it abandoned. (ECF No. 119, PageID 1658-61.)

have been strengthened as a result of the materials discovered in these proceedings. He also presents a new ground for relief, his thirty-sixth, based on the same discovery material, and asks that this Court stay his habeas petition to allow him to return to the state court to exhaust his new claim. Hasan moves to amend his petition to include the new evidence and claim, for additional discovery, and for an evidentiary hearing as well.

## RELEVANT STANDARDS

### Expansion of the Record

"When expansion of the record is used to achieve the same end as an evidentiary hearing, the petitioner ought to be subject to the same constraints that would be imposed if he had sought an evidentiary hearing." *Boyko v. Parke,* 259 F.3d 781, 790 (7th Cir. 2001). Pursuant to the AEDPA, a prisoner may introduce new evidence in support of an evidentiary hearing or relief without an evidentiary hearing "only if [the prisoner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met." *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004), *citing Williams v. Taylor*, 529 U.S. 420, 431-37 (2000).

The limitation in *Cullen v. Pinholster*, 563 U.S. 170 (2011), where the Supreme Court held that federal habeas review of state court merits determinations is limited to the record that was before the state court, applies to expansion of the record as well as to evidentiary hearings. *Moore v. Mitchell*, 708 F.3d 760, 780-784 (6th Cir. 2013). *Moore* explained that

> In any event, expansion of the record does not necessarily require
> that the district court consider that evidence in evaluating the

merits of the habeas claim. Expansion of the record can assist the
district court in deciding other issues besides the merits of the
claim. . . . For example, it can sometimes be necessary to see if a
petitioner has met the diligence requirement of § 2254(e)(2) for
claims not adjudicated on the merits by the state court.

*Moore*, 708 F.3d at 784. This Court has very recently noted, however, that

A claim of actual innocence offered to excuse procedural default is
not a substantive claim for habeas corpus relief, but a "gateway"
claim and therefore not subject to the *Pinholster* restrictions."
*Pettus-Brown v. Warden*, 2015 U.S. Dist. LEXIS 11884, *2, 2015
WL 422557 (S.D. Ohio [Feb. 2,] 2015). "*Pinholster* does not by
its own terms apply to the actual innocence exception to either
procedural default or the statute of limitations." *Clemmons v.
Warden*, 2012 U.S. Dist. LEXIS 146029, *19, 2012 WL 4811122
(S.D. Ohio [Oct. 10,] 2012).

*Ogle v. Mohr*, No. 2:15-cv-776, 2017 WL 951489, *34 (S.D. Ohio Mar. 10, 2017)(Report and

Recommendations). Thus, a petitioner's motion for an expansion of the record may avoid

*Pinholster*'s strictures under such circumstances.


**Motion to Amend**

The Civil Rule governing pleading amendments, Federal Rule of
Civil Procedure 15, made applicable to habeas proceedings by §
2242, Federal Rule of Civil Procedure 81(a)(2), and Habeas
Corpus Rule 11,[3] allows pleading amendments with "leave of
court" any time during a proceeding. See Fed. Rule Civ. Proc.
15(a). . . . Amendments made after the statute of limitations has
run [must] relate back to the date of the original pleading . . .
[which is to say they must arise] "out of the [same] conduct,
transaction, or occurrence" [as was originally pleaded]. Rule
15(c)(2).

*Mayle v. Felix*, 545 U.S. 644, 655 (2005). In considering whether to grant motions to amend

under Rule 15, a court should consider whether the amendment would be futile. *Colvin v.

Caruso*, 605 F.3d 282, 294-95 (6th Cir. 2010) *citing Crawford v. Roan*, 53 F.3d 750, 753 (6th Cir.

---

[3] Habeas Corpus Rule 11 was renumbered in 2009 and is now Habeas Corpus Rule 12.

1995).  Likewise, a motion to amend may be denied if it is brought after undue delay or with dilatory motive.  *Foman v. Davis*, 371 U.S. 178 (1962); *Miller v. United States*, 561 Fed.Appx. 485, 489 (6th Cir. 2014.)

**Motion for Discovery**

A habeas petitioner is not entitled to discovery as a matter of course, but only upon a fact-specific showing of good cause and in the Court's exercise of discretion.  Rule 6(a), Rules Governing § 2254 Cases; *Bracy v. Gramley*, 520 U.S. 899 (1997); *Harris v. Nelson*, 394 U.S. 286 (1969); *Byrd v. Collins*, 209 F.3d 486, 515-16 (6th Cir. 2000).  Before determining whether discovery is warranted, the Court must first identify the essential elements of the claim on which discovery is sought.  *Bracy*, 520 U.S. at 904, *citing United States v. Armstrong*, 517 U.S. 456, 468 (1996).  The burden of demonstrating the materiality of the information requested is on the moving party.  *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001), *citing Murphy v. Johnson,* 205 F.3d 809, 813-15 (5th Cir. 2000).  "Even in a death penalty case, 'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery or require an evidentiary hearing.'" *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003), *quoting Stanford*, 266 F.3d at 460.

**Motion for an Evidentiary Hearing**

Under the AEDPA, 28 U.S.C. § 2254(e)(2), an evidentiary hearing is available to a petitioner if

(A) the claim relies on

> (i.)     a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii.)     a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Hasan does not request an evidentiary hearing for the purpose of "establishing by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense," however. Rather, he does so in order to demonstrate his actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1986), or post-conviction counsel's ineffective assistance in an attempt to excuse any procedural default of the claims herein pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). (ECF No. 185, PageID 13921-22.) It is far from clear, however, that *Martinez* and *Trevino* are applicable in Ohio.

The Sixth Circuit has observed as follows:

> In *McGuire* [*v. Warden*, 738 F.3d 741 (2013)], we noted that "one could argue that the category requiring evidence *outside* the record must be brought on collateral review in order for review to be meaningful, suggesting the possibility that the *Martinez* exception could apply for that category of I[neffective] A[ssistance of] [T]rial C[ounsel] claims. 738 F.3d at 751-52. But we also explained that, in the "ordinary" Ohio case, "ineffective assistance of [trial] counsel . . . is an issue that can be brought on direct appeal." *Id*. at 752 (quoting *State v. Combs*, 100 Ohio App. 3d 90 (1994) (collecting Ohio cases)). "Arguably, then, the review of trial counsel ineffectiveness claims in Ohio is more 'meaningful' than Texas [where the *Trevino* case originated], because in Ohio there is 'ordinarily' the availability of direct review with a constitutionally required counsel, with the back-up of collateral attack where evidence outside the record is required." *Id*. We chose not to answer the question [whether *Trevino* is applicable in

> Ohio] in *McGuire*, as our discussion merely "showe[ed] that the application of *Trevino* to Ohio ineffective-assistance claims is neither obvious nor inevitable." *Id.* We have not answered it since. See *Williams v. Mitchell*, 792 F.3d 606, 615 (6th Cir. 2015). We do not do so today. . . .

*Hill v. Mitchell*, 842 F.3d 910, 937-38 (2016). Most recently, the Sixth Circuit stated, "This court has not yet determined whether *Trevino* applies to cases that arise in Ohio." *Moore v. Mitchell*, 848 F.3d 774, 777 (6th Cir. 2017). Rehearing *en banc* was denied in that case on May 3, 2017, and the United States Supreme Court denied certiorari on January 8, 2018, *Moore v. Mitchell*, Case No. 17-6239, 2018 WL 311488, 2018 U.S. LEXIS 415 (Jan. 8, 2018).


## Motion for Stay

District courts have authority to grant stays in habeas corpus cases to permit exhaustion of state court remedies in consideration of the AEDPA's preference for state court initial resolution of claims. However, in recognizing that authority, the Supreme Court explained that

> [S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. Cf. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). . . .

> On the other hand, it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.

*Rhines v. Weber*, 544 U.S. 269, 277-78 (2005). "Staying a federal habeas petition frustrates [the] AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of federal proceedings." *Id*. at 277.


# ANALYSIS

## Fourth Ground for Relief

In his fourth ground for relief in his petition, Hasan argued the ineffectiveness of his trial counsel due to their failure to pursue a challenge to the grand jury's composition. Specifically, he alleged that based on some of the jurors' having signed a petition advocating application of Ohio's death penalty statute, those grand jurors who returned the indictment in his case were biased. Hasan requests permission to amend his fourth ground to include reference to evidence previously withheld by the state and discovered in these habeas proceedings, for additional discovery, and to supplement the record with the evidence referenced and discovered. He also asserts that assuming the evidence could have been found had his post-conviction counsel exercised due diligence, counsel were ineffective in not discovering it,[4] invoking *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013)[5] in an attempt to avoid any procedural default of his claim.

---

[4] Oddly, in arguing the applicability of *Martinez* and *Trevino*, Hasan refers to his first post-conviction counsel as "Hon. Chuck Stidham," as he lays out Mr. Stidham's ineffective representation and his disciplinary history which ultimately resulted in his indefinite suspension from the bar. (ECF No. 185, PageID 13862.) Aside from the obvious inconsistency, the term "Honorable," is a title of respect reserved for "judges, members of the U[nited] S[tates] Congress, ambassadors, and the like. . . . The abbreviation Hon. should be used only in mailing addresses." Bryan A. Garner, Garner's Dictionary of Legal Usage 413(3rd ed. 2011).

[5] Hasan refers to *Trevino* as "*Trevino*" and "*Thaler*" interchangeably when citing to the case in short form. (*See e.g.,* ECF No. 185 PageID 13861-63.) The Court adheres to the long tradition of using the first name in a case caption for short-form citation. THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION Citation 16, 22-23 (Columbia Law Review Ass'n et al. eds., 20th ed. 2015).

Hasan was indicted on non-capital charges in an indictment returned December 27, 1993. (ECF No. 166-1, PageID 13650-54.)  An indictment on capital charges followed on July 29, 1994.  *Id.* at PageID 13655-58.  He contends that three grand jurors signing the non-capital indictment and three signing the capital indictment also signed a petition advocating as follows:

> We the undersigned request and demand that the present statute of the Death Penalty in the State of Ohio be applied as the passers intended it to be.
>
> We feel that Governor George V. Voinovich, President of the Senate Stanley Arnoff [sic], and Speaker of the House Vernal G. Riffe must accept their responsibility to carry out the wishes of the Voters of the State of Ohio.  Two appeals are enough.

(ECF No. 166-2, PageID 13650-64.)  The petition contains no date, and it does not indicate any particular individual or case the signers might have had in mind when they signed the petition.

Respondent opposes Hasan's request for the relief noted, arguing that Hasan's claim of grand juror bias is not cognizable in habeas corpus since it does not implicate the federal constitution.  (ECF No. 188, PageID 13930-35.)  He further contends that Hasan's argument is contrary to Ohio R. Crim. P. 6, which provides no mechanism with which to challenge individual jurors' temperaments, *id.*, and therefore Hasan's trial counsel were not ineffective for failing to pursue the unwinnable grand-jury issue.

The Court notes that in these proceedings Hasan never identified his attorneys' failure to pursue any perceived violation of state law or challenging grand jurors' impartiality as a claim underlying his claim of ineffective assistance of trial counsel.  (Petition, ECF No. 16, PageID 2061-62; Motion to Amend, etc., ECF No. 185, PageID 13853-60.)  In both his petition and his motion, he cites only the federal constitution as having been violated by his trial counsel's alleged ineffectiveness.  Thus, the Court need not address Respondent's argument that his counsel were ineffective for not alleging a violation of Ohio R. Crim. P 6(B)(1).  The Court

notes, however, that under that rule as it existed at the time of Hasan's proceedings in the state courts,[6] even if the petition signers are subtracted from the indictments, each indictment still has at least seven grand jurors voting for indictment; seven remaining jurors voted for Hasan's indictment on the non-capital charges, and nine on the capital charges.[7]  (ECF No. 166-1, PageID 13652, 13655.)  Accordingly, his trial counsel would not have been ineffective in failing to pursue this meritless claim in the state courts.

Moreover, there is no federal constitutional right to an indictment in state criminal proceedings.  *Hurtado v. California*, 110 U.S. 516, 537-38 (1884).  As the Sixth Circuit has observed:

> The Fifth Amendment's guarantee of a grand jury indictment in cases of capital crimes . . . has never been incorporated into the Fourteenth Amendment and hence is not applicable to the states. In *Hurtado v. California*, 110 U.S. 516 (1884), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment did not require a grand jury indictment in a prosecution by the State of California for a capital crime.  While it is true that *Hurtado* once stood in a line of Supreme Court cases that refused to incorporate Bill of Rights guarantees relating to criminal procedure into the Fourteenth Amendment and while it is true that such older precedent, except for *Hurtado*, has been overruled and most of the Bill of Rights Guarantees relating to criminal procedure have been

---

[6]  At the time of Hasan's indictment, Ohio R. Crim. P. 6 provided in relevant part as follows:

**(B)**    **Objections to grand jury and to grand jurors**
(1)    *Challenges*.  The prosecuting attorney, or the attorney for a defendant who has been held to answer in the court of common pleas, may challenge the array of jurors or an individual juror on the ground that the grand jury or individual juror was not selected, drawn, or summoned in accordance with the statutes of this state.  Challenges shall be made before the administration of the oath to the jurors and shall be tried by the court.
       . . .
**(F)**    **Finding and return of indictment**
       An indictment may be found only upon the concurrence of seven or more jurors.

[7] Hasan contends that "[a] biased grand juror constitutes a structural error (ECF No. 185, PageID 13857)," but "[i]n the grand jury context, the only identified structural error to date is discrimination on account of race or sex in the selection of grand jurors."  *United States v. Harmon*, 833 F.3d 1199, 1204 (9th Cir. 2016), *citing Bank of Nova Scotia*, 487 U.S. 250, 257 (1988).  No such bias is alleged here.  Furthermore, Hasan cites *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013), as support for his claim of structural error, but the discussion there relates to judicial bias, not grand juror bias.

> incorporated into the Fourteenth Amendment as fundamental
> rights, *Hurtado* remains good law.

*Watson v. Jago*, 558 F.2d 330, 337 (6th Cir. 1977). *Hurtado*'s status has not changed since

*Watson. See McDonald v. City of Chicago*, 561 U.S. 742, 810 (2010); *Albright v. Oliver*, 510

U.S. 266, 272-73 (1994); *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 417 (4th Cir. 2014);

*Coles v. Smith*, 577 Fed.Appx. 502, 506 (6th Cir. 2014). Thus, Hasan's trial counsel were not

ineffective for failing to pursue the grand jury issue on the theory that the federal constitution

guarantees him an unbiased grand jury in state proceedings.

Hasan suggests that this Court could consider his fourth ground for relief and the new

evidence he submits to support it under its ancillary jurisdiction pursuant to 28 U.S.C. § 1367,

citing *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365 (1978). (ECF No. 185, PageID

13863.) Federal habeas courts, however, are not empowered to consider any claims that do not

implicate the federal constitution. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "The doctrine

of ancillary (or 'pendent' or 'supplemental' jurisdiction) has never been extended to habeas

corpus." *Kirchoff v. Robinson*, No. 1:13-cv-362, 2014 WL 4983914 at *3 (S.D. Ohio Oct. 6,

2014)(Supplemental Report and Recommendations, Merz, M.J.), *adopted* 2016 WL 5387691

(S.D. Ohio, Sept. 27, 2016)(Barrett, D.J.).

Furthermore, since the underlying claim is not cognizable in habeas corpus, neither

*Martinez v. Ryan*, 566 U.S. 1 (2011), nor *Trevino v. Thaler*, 569 U.S. 413 (2013) come into play,

nor is there any reason for this Court to grant Hasan's request to expand the record, to amend his

petition, to grant discovery or an evidentiary hearing, or to permit Hasan to return to the state

court to exhaust his meritless claim of trial counsel's ineffectiveness. Granting any of the

requested process, including the application of 28 U.S.C. § 2254(b)(1)(B)(ii) to Hasan's claim

(*see* ECF No. 185, PageID 13864) to avoid a return to state court, is unwarranted. Hasan's

requests respecting his Fourth Ground for Relief are accordingly **DENIED**.

**Eighth and Ninth Grounds for Relief**

In his eighth and ninth grounds for relief, Hasan claimed his trial counsel's representation was ineffective because they failed to present evidence through available witnesses to raise doubt in the minds of the jurors, and by their inadequate cross-examination of the State's witnesses. (ECF No. 185, PageID 13866.)

Respondent counters that Hasan has offered nothing new in his motion respecting his eighth and ninth grounds for relief. (ECF No. 188, PageID 13938.) Rather, Respondent contends the evidence Hasan submits in support of his motion "is nothing more than the same quibbling over which inmate or inmates was the actual 'hands-on' killer of Corrections Officer Vallandingham." *Id*. In addition, Respondent reminds the Court of its earlier conclusions that Hasan's eighth and ninth grounds for relief are procedurally defaulted. *Id*. at PageID 13940-41.

Hasan requests an evidentiary hearing at which he intends to demonstrate that the procedural default of his claims should be excused either because he is actually innocent of the offenses of which he was convicted, or because his post-conviction counsel were ineffective for failing to raise and preserve the claims in the state court.

Hasan first invokes *Schlup v. Delo*, 513 U.S. 298 (1986), just as he did in his original petition. As this Court observed in its Report,

> In *Murray v. Carrier*, 477 U.S. 478, 496 (1986), the Supreme Court allowed that "where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." More recently, the Sixth Circuit Court of Appeals has summarized what has come to be known as "the *Schlup* actual innocence gateway" as follows:

The United States Supreme Court has held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). . . . In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

*Souter v. Jones*, 395 F.3d 577, 588-89 (6th Cir. 2005) (parallel citations omitted). To be credible, a claim of actual innocence requires that the allegations of constitutional error be supported with reliable evidence, such as "'exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . that was not presented at trial.'" *House v. Bell* ___ U.S. ___, ___, 126 S.Ct. 2064, 2077 (2006), *quoting Schlup*, 513 U.S. at 324. Consequently, such claims are rarely successful. *Schlup*, 513 U.S. at 324, *See also House*, 126 S.Ct. at 2077 (observing that "it bears repeating that the *Schlup* standard is demanding and permits review only in the extraordinary case"). In his concurrence in part and dissent in part in *House*, Chief Justice Roberts noted that in a claim of actual innocence under *Schlup*, "the new evidence is not simply taken at face value; its reliability has to be tested." *House*, at 126 S.Ct. at 2088. While the majority and the dissenters disagreed as to whether the reliability of House's new evidence had been sufficiently established, there was no dispute that where a petitioner seeks to avail himself of the *Schlup* actual innocence gateway, the reliability of the new evidence is of paramount importance.

(Report and Recommendations, ECF No. 81, PageID 1092-93.) Although the reliability of the petitioner's new evidence is evaluated, "the district court is not bound by the rules of admissibility that would govern at trial." *Schlup*, 513 U.S. at 327. Rather, the court must "make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after

the trial.'" *Id.* at 328 (*quoting* Henry J. Friendly, *Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 160 (1970)).  Moreover,

> [W]hen considering an actual-innocence claim in the context of a request for an evidentiary hearing, the Court need not "test the new evidence by a standard appropriate for deciding a motion for summary judgment," but rather may "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."

*House*, 547 U.S. at 537, *quoting Schlup*, 513 U.S. at 331-32.

Hasan starts out misstating the *Schlup* standard.  He contends his burden under *Schlup* is to "demonstrate that it is more likely than not that a reasonable juror, given all the evidence presented to the habeas court, would not have found the petitioner guilty beyond a reasonable doubt" (ECF No. 185, PageID 13868-69, 13871), whereas *Schlup* actually requires him to show that more likely than not, *no* reasonable juror would have found him guilty beyond a reasonable doubt.  The difference is not merely a matter of semantics.  Hasan's statement of the standard implies that if only one reasonable juror would find him not guilty of the offenses charged, he will have met his burden under *Schlup*.  (ECF No. 185, PageID 13879, contending that "[r]easonable doubt on any one of [the elements of the offense] . . . may have been enough to sway a single reasonable juror.")  The actual standard as stated in *Schlup* and reaffirmed in *House v. Bell*, 547 U.S. 518 (2006), establishes that Hasan must demonstrate that in light of all the evidence old and new, even if only one reasonable juror would vote to convict him, he will have failed to meet his burden.  As noted above, the *Schlup* standard is intentionally "demanding and permits review only in the extraordinary case."  *House v. Bell*, 547 U.S. 518, 538 (2006)(internal quotation marks omitted), *citing Schlup*, 513 U.S. at 327.

Hasan is also mistaken when he repeatedly and incorrectly states, without citation to authority, that his new evidence "must be taken as true" by this Court in its consideration of his

*Schlup* actual innocence claim. (ECF No. 185, PageID 13849, 13871, 13889, 13892, 13894, 13897, 13903, 13907, 13910). In his concurrence in part and dissent in part in *House*, Chief Justice Roberts observed as follows:

> In *Schlup*, we stated that a habeas petitioner attempting to present a defaulted claim to a federal court must present "new *reliable* evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." 513 U.S., at 324 (emphasis added). Implicit in the requirement that a habeas petitioner present reliable evidence is the expectation that a factfinder will assess reliability. The new evidence at issue in *Schlup* had not been subjected to such an assessment – the claim in *Schlup* was for an evidentiary hearing – and this Court specifically recognized that the "new statements may, of course, be unreliable." *Id.*, at 331. The Court stated that the District Court as the "reviewing tribunal," was tasked with assessing the "probative force" of the petitioner's new evidence of innocence, and "may have to make some credibility assessments." *Id.*, at 327-328, 330. Indeed, the Supreme Court took the unusual step of remanding the case to the Court of Appeals "with instructions to remand to the District Court," so that the District Court could consider how the "likely credibility of the affiants" bears upon the "probable reliability" of the new evidence. *Id.*, at 332. In short, the new evidence is not simply taken at face value; its reliabilty has to be tested.

*House*, 547 U.S. at 556-57 (parallel citations omitted). *See McCray v. Vasbinder*, 499 F.3d 568 (6th Cir. 2007) (evaluating credibility and contradictions in new evidence, concluding petitioner had not made the requisite showing of actual innocence); *Chavis-Tucker v. Hudson*, 348 Fed.Appx. 125 (6th Cir. Oct. 9, 2009) (interpreting *Schlup*'s use of the phrase "new evidence" to mean newly discovered evidence, evaluating affidavits submitted in support of *Schlup* actual innocence claim, and finding the evidence submitted did not create a compelling picture of actual innocence). *See also Teleguz v. Pearson*, 689 F.3d 322, 331-32 (4th Cir. 2012) (remanding for credibility assessments of newly presented evidence presented in connection with a *Schlup* claim of actual innocence); *Doe v. Menefee*, 391 F.3d 147, 172 (2nd Cir. 2004) (noting that *Schlup*

dictates new evidence of a petitioner's actual innocence be subjected to a credibility determination in light of the totality of evidence in the record); *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 552 (7th Cir. 2001) (noting that *Schlup* requires the district court to consider the credibility of the petitioner's new evidence); *Amrine v. Bowersox*, 128 F.3d 1222, 1230 (8th Cir. 1997) (remanding for an assessment of the reliability of the new evidence submitted to support a *Schlup* claim of actual innocence). Thus, the materials Hasan has submitted in support of his *Schlup* actual innocence claim must be viewed with a critical eye, not "taken as true" as he asserts.

Hasan's burden is to demonstrate that no reasonable juror would have found him guilty beyond a reasonable doubt of the offenses charged if the evidence presented in his post-conviction proceedings and discovered in these habeas proceedings had been considered by his jury. It is necessary, then, to summarize the evidence that was before the state courts and that which Hasan contends should have been discovered by his attorneys so it can be determined what, if any, of Hasan's new evidence is of the sort that would leave any reasonable juror unconvinced of his guilt beyond a reasonable doubt. In doing so, the Court will summarize the testimony of each witness who testified at Hasan's trial along with any new evidence he has presented that challenges the witnesses' testimony or credibility.[8] That will be followed by summaries of evidence not presented at trial, specifically that presented in post-conviction and in his application to reopen his direct appeal.

---

[8]     Several witnesses testified in the defense's case-in-chief and/or mitigation phase of Hasan's trial, but provided no testimony relevant to Hasan's participation in Vallandingham's murder. Consequently, their testimony is not summarized. Those witnesses are inmates Isaac Hughes, William Martin, Frederick Crowder, Robert Jenkins, Thomas Hurst, John Clark, Abdul-Haqq-Muballigh as well as Deputy Warden David See, Imam Ali Abdul-Jamii, Criminal Justice Consultant Joseph Rowan, and Hasan's sister Catherine Sanders.

**TESTIMONY AT TRIAL**

**Testimony of Correctional Officers, Prison Personnel, and Law Enforcement**

    **Correctional Officer Michael Hensley**

Correctional Officer (CO) Michael Hensley testified that he witnessed Hasan and two other inmates attacking CO George Horsley, striking him with handcuffs and a baton, and taking CO Horsley's keys. (ECF No. 164-4, PageID 11871-74.) Hasan used the keys to turn on the console that controlled the doors on the cells in the cellblock. *Id*. at PageID 11886. After inmates moved CO Hensley to an office, Hasan told him what to say on a telephone call with other prison personnel. *Id*. at PageID 11905. Hasan instructed an inmate to watch Hensley and two other COs while Hasan went to secure other areas of the complex, and when Hasan returned and saw that the inmate had hit one of the COs, he chastised the inmate. *Id*. at PageID 11906. Hensley stated the Muslims were in charge of him during his captivity and that Hasan was the leader of the Muslims. *Id*. at PageID 11922. When inmates were insisting on killing inmate Bruce Harris, Hasan initially said "not yet" (ECF No. 164-5, PageID 12024), but later Hensley heard Hasan give the order saying, "Serve him," which meant to Hensley that the inmates should kill the person. (ECF No. 164-4, PageID 11924; ECF No. 164-5, PageID 12021, 12026.)

    **Correctional Officer Robert Mitchell**

CO Robert Mitchell testified that he saw Hasan and another inmate attacking CO Larry Dotson soon after the riot began. (ECF 163-2, PageID 9240-41.) Hasan approached the crash gate behind which Mitchell had retreated, and told him, "If you have anything to say, address it to me. I'm running this," or words to that effect three times. *Id*. at PageID 9242, 9244.

### Correctional Officer Darrell Shepherd

CO Darrell Shepherd also saw Hasan and other inmates attacking CO Larry Dotson. (ECF No. 163-2, PageID 9179.)

### Correctional Officer Lester Buckner

CO Lester Buckner stated that he saw Hasan come to the crash gate after he attacked CO Dotson and threatened CO Buckner, saying that Buckner would be the first one killed if Hasan could get to him. (ECF No. 163-2, PageID 9281-83.) He also heard Hasan claim to be "running this show." *Id*. at PageID 9286.

### Correctional Officer James Kirkpatrick

CO James Kirkpatrick's account of Hasan's participation in Dotson's beating and claiming to be in control of the riot matched those of the other officers. (ECF 163-3, PageID 9325.)

### Correctional Officer Vern Viar

CO Vern Viar was also at the crash gate, and testified that Hasan told him, "This is my institution and I will show them how to run this institution." *Id*. at PageID 9362. Hasan ordered the inmates to open the L-1 section of the complex and said if anyone, presumably an officer, opened a gate, he would kill them and that no one would be spared. *Id*. at PageID 9378-80. CO Viar also recalled Hasan ordering the inmates to leave a CO alone after they had approached the unconscious officer and kicked him. *Id*. at PageID 9384-85.

### Correctional Officer Conrad Nagel

Conrad Nagel was a CO at the Lucasville institution at the time of the riot. He heard Hasan directing an inmate to take the CO hostages into block L-6. (ECF No. 163-3, PageID 9427.)

### Warden Arthur Tate

Arthur Tate, who was the warden at the Lucasville institution at the time of the riot, testified that although he could not say who the inmates' representatives were at the time the threat to kill a CO was made, as the riot wound down, negotiations were carried on with inmate representatives Jason Robb, Anthony Lavelle, and Hasan. (ECF Nos. 163-1, PageID 8971; 163-2, PageID 9055.)

### Ohio Highway Patrol Sergeant Howard Hudson

Sergeant Howard Hudson of the Ohio Highway Patrol was involved in the negotiations with the inmates, too. He testified that Hasan was one of the inmate representatives at the face-to-face meetings. (ECF No. 163-7, PageID 10394-95.) He stated that Hasan's leadership role from the beginning to the end of the riot, his involvement in the negotiations to end the uprising, and witnesses' statements had caused him to conclude that Hasan was chairing the meeting at which the inmates voted to kill a correctional officer. (ECF No. 163-10, PageID 10913.)

**Testimony of Inmates**

### Inmate John Fryman

Inmate John Fryman testified that at the beginning of the riot the Muslim Imam Hasan directed inmates to take the CO hostages to various locations within the cell block.  (ECF No. 163-4, PageID 9480, 9493.)  He also testified that when Hasan was standing up range from him, Fryman saw Muslims coming toward him and heard Hasan scream "Stop that motherfucker, kill that white motherfucker!" meaning Fryman.  *Id.* at PageID 9501, 9558.  Hasan then kicked him and stabbed him and was joined by other Muslims who also attacked Fryman.  *Id.*

**Inmate Stephen Macko**

Inmate Stephen Macko testified that Hasan was a high-ranking Muslim and that it was Hasan who had ahold of CO Vallandingham as he was being led from a bathroom down the hallway during the riot.  (ECF No. 163-4, PageID 9586, 9598.)  At times, Macko seemed very unsure of what he saw, first testifying that he thought he saw Hasan strike Vallandingham with a baseball bat, then expressed uncertainty, stating that he thought he made a mistake, and that he testified in George Skatzes'[9] trial that he had seen inmate James Were strike Vallandingham.  *Id.* at PageID 9618-19.  Further on in his testimony, he completely equivocates on his identification of Hasan as the bat wielder, but firmly identifies Hasan as the one who put handcuffs on Vallandingham.  *Id.* at PageID 9632-33.

**Inmate Miles Hogan**

Inmate Miles Hogan was summoned by Hasan and felt he had no choice but to go to him because he "carried a lot of weight and was pretty much the guy mostly in charge."  (ECF No. 163-4, PageID 9667-68.)  After being put in a cell and threatened by other inmates, he called for Hasan because "it was apparent he was in charge."  *Id.* at PageID 9669-70.  Hasan came and told

___
[9] George Skatzes is another capitally charged and convicted Lucasville inmate who participated in the riot.

the inmates they weren't going to do anything to Hogan and took him to an area of the prison controlled by the Muslims. *Id*. at PageID 9671-72, 9674-75. While there, Hogan overheard inmates informing Hasan that the person who was supposed to kill a CO had backed out, to which Hasan responded that "he was sick of the motherfuckers saying they was going to do something and then back[ing] out of it at the last minute." *Id*. at PageID 9682. Hasan stated that "somebody better do it." *Id*. at PageID 9683. Hogan further testified that, with respect to inmate Bruce Harris, who had been disrupting the Muslim prayers, Hasan went upstairs saying that he was going to "kill that bitch." *Id*. at PageID 9685. Hogan credits Hasan for saving his life, but tempers his gratitude by saying there wouldn't have been a riot and his life would never have been in danger in the first place but for Hasan. *Id*. at PageID 9691. Hogan repeatedly stated that Hasan was the leader, or at least one of the leaders of the riot. (ECF No. 163-5, PageID 9729, 9742, 9751, 9781.) He saw Hasan strike CO Conrad Nagel with a baton and overheard Hasan discussing killing a guard with inmates George Skatzes and Stanley Cummings. *Id*. at PageID 9744, 9770.

### Inmate Reginald Williams

Inmate Williams was a member of Hasan's group of Muslims. (ECF No. 163-5, PageID 9786-88.) According to his testimony, on the day the riot broke out, he was with Hasan out in the exercise yard and a discussion was held during which Hasan decided some of his group of Muslims were going to barricade themselves inside the L-6 block. *Id*. at PageID 9812-14. Hasan directed Williams to get a knife from another inmate and participate in attacking inmate John Fryman because he was reputed to be a snitch. *Id*. at PageID 9815, 9820. Williams did not admit actually participating in the attack on Fryman, but he identified Hasan and Skatzes as two

inmates who joined in Fryman's beating. *Id.* at PageID 9826-28. Williams was also assigned to assist Leroy Elmore in holding a CO and getting his keys. *Id.* at PageID 9816. Williams testified that Hasan told him to go to block L-1 and bring to him any COs who were held there. *Id.* at PageID 9834, 9915. After he retrieved CO Vallandingham from L-1 and delivered him to Hasan in L-6, Hasan told him to establish communication with the Warden's office via telephone, which he did. *Id.* at PageID 9841. Then he was told to go cell to cell collecting every piece of food he could find. *Id.* at PageID 9842. Williams stated that in a meeting one night with other inmates, Hasan and Jason Robb decided that a guard would be killed if communication with the FBI was not accomplished, and that the next morning, the "shot callers" of the riot, Robb, Skatzes, Hasan, Lavelle, Cummings, Gordon, and Elmore, were just leaving a meeting when he arrived at the L-2 block. (ECF No. 163-5, PageID 9850-52.) Hasan also provided the knife another inmate used to kill Bruce Harris, according to Williams, who admitted his own role in that killing, too. *Id.* at PageID 9859-60.

On cross-examination, Williams testified that Hasan taught a strict moral code that forbade homosexuality and intoxication. *Id.* at PageID 9895. He stated that he had his own reasons for wanting to attack Fryman, that Hasan ordered him to "do something," and that he was not instructed by Hasan to kill anyone except Fryman. *Id.* at PageID 9905, 9910. Williams reiterated that Hasan and Robb were leading the meeting in which it was decided that a guard should be killed if certain demands were not met, but then clarified that they agreed to threaten to kill a guard, not to actually kill him. *Id.* at PageID 9935-38. Hasan was not present, however, when the threat was conveyed to law enforcement and institutional personnel on the scene. *Id.* at PageID 9942. Williams testified that after a meeting at which Hasan was present, Were blurted out that "he'd do it after the meeting," and about two months after the riot, Were admitted to

Williams to having killed Vallandingham.  (ECF No. 163-6, PageID 9954-55.)

On redirect examination, Williams again stated that Hasan gave him the order to kill Johnny Fryman, and to round up the COs, including Vallandingham.  *Id*. at PageID 9977.  He also repeated that Hasan led the meeting in which the inmates decided to kill a guard, that Hasan was one of the leaders of the riot, and that Hasan was the one "calling the shots" after Muslims gained control of certain areas of the L block of the prison.  *Id*. at PageID 9978.  On re-cross, however, it came out that Williams' understanding of the reason for Hasan's order to round up the COs was so that they would be protected from other inmates.  *Id*. at PageID 9979.

### Inmate Kenneth Law

Inmate Kenneth Law turned to Islam after arriving at Lucasville in June 1992.  (ECF No. 163-6, PageID 9988.)  On the first day of the riot, he recalled seeing Hasan at the crash gate yelling at the guards on the other side of the gate, empty handed.  *Id*. at PageID 10013.  Law testified that the Muslims were in charge during the riot.  *Id*. at PageID 10017.  Law saw inmates taking Vallandingham into the shower and watched two of them trying to strangle the guard with an electrical cord, and made it clear that Hasan was not a direct participant in Vallandingham's murder.  *Id*. at PageID 10035-39.

Law described a conversation he had with Hasan on the last day of the riot, testifying that an inmate asked Hasan why Vallandingham was killed, and that Hasan responded, "It was one or many."  *Id*. at PageID 10048-49.  Law stated that Hasan was upset when he learned that some inmates had been murdered at the beginning of the riot, and was hollering, "Who ordered that?"  *Id*. at PageID 10097.  During the rest of the riot, Hasan was mostly in an area by himself with his security contingent.  *Id*. at PageID 10101.  On the morning that Vallandingham was murdered,

Law saw Hasan at the console, and heard him say to Were that if Were didn't hear from him in the next half hour, Were was to "take care of his business." *Id.* at PageID 10104, 10108-9. Were's "business" turned out to be killing Vallandingham and he instructed a couple of inmates to do the killing. *Id.* at PageID 10110-14. Law also testified that the inmates held in Muslim custody during the riot were not hurt and that they were in custody for their own safety. *Id.* at PageID 10125. He never heard Hasan order Harris' killing. *Id.* at PageID 10126. The jury was aware that Law had cut a deal in exchange for his testimony. *Id.* at PageID 10068, 10117-20.

**Inmate Roger Snodgrass**

Roger Snodgrass was an inmate affiliated with the Aryan Brotherhood, a white supremacist prison gang. (ECF No. 163-6 , PageID 10131-37.) He testified that he had seen the leaders of the Aryan Brotherhood, Freddie Snyder; Muslims, Hasan; and the Black Gangster Disciples, Anthony Lavelle, meeting twice in the weeks before the riot. *Id.* at PageID 10138-41. Snodgrass described the pandemonium that occurred as the riot began and stated that he saw George Skatzes, Jason Robb, and Hasan with three COs, one of whom was on the phone saying what the inmates directed him to say. *Id.* at PageID 10161-72. Snodgrass saw Hasan, Robb, Jesse Bocook, and Skatzes the next day and heard Hasan tell the others, "If they rush this place, you serve them COs, because you can believe they're going to serve us," explaining that to "serve" someone in prison meant to kill them. *Id.* at PageID 10173-74. When the Aryan Brotherhood was looking for a place to take under their control, Hasan directed them to the L-2 block, and they took it over. *Id.* at PageID 10188. Snodgrass described meetings with Hasan, Skatzes, Robb, and Lavelle in which it was discussed which guard would be released if the inmates had some of their demands met. *Id.* at PageID 10193. During those meetings, Hasan

stressed that the guards had to be kept safe so they could be used as bargaining chips with prison officials and law enforcement.  *Id*. at PageID 10195.

Meetings between the inmate leaders took place every morning, and sometimes two or three times a day, with each of the three groups having two votes on any decisions to be made. *Id*. at 10197.  Hasan was a constant as one of the Muslim representatives, and was joined by one of four other Muslim inmates in the voting process.  *Id*. at PageID 10198.  The meetings were presided over by the three "first chairs"; Hasan, Robb, and Lavelle, and everything Hasan wanted done got done.  (ECF No. 163-6, PageID 10199, ECF No. 163-7, PageID 10318.) Snodgrass heard the topic of killing a guard mentioned or discussed at every meeting he attended before Vallandingham's murder.  (ECF No. 163-6, PageID 10199-200.)  After the Tess Unwin statement,[10] a vote was taken on whether to kill a guard, and Snodgrass recalled that only George Skatzes expressed reservations about doing so.  (ECF 163-6, PageID 10200-1.)

Later, Snodgrass and Bocook became aware of a plot by some other inmates to overthrow the riot leadership, which they reported to Hasan.  *Id*. at PageID 10207.  Hasan then ordered some of his security team to bring the plotters to the Muslim-controlled area of the block, and he locked them in a cell.  *Id*. at PageID 10207-8.  Robb, an Aryan Brotherhood leader, wanted the plotters turned over to him, and Hasan said he would do so, but kept putting it off until the last day of the riot when he informed Robb that the three men had converted to Islam and would not be surrendered to Robb.  (ECF No. 163-7, PageID 10243-47.)  Snodgrass testified that he never saw Hasan personally attack anyone, but that he heard Hasan order the guards killed if the prison was stormed by law enforcement.  *Id*. at PageID 10303.  Hasan also ordered inmates to beat another inmate, and sent a Muslim messenger to Lavelle to tell him that Lavelle could send a

---

[10] Tess Unwin was an Ohio Department of Rehabilitation and Correction employee who made a statement to the news media that suggested the inmates were bluffing about killing a correctional officer.  The statement infuriated the inmates.

Black Gangster Disciple to beat Bruce Harris for raping a young white inmate at the beginning of the riot. *Id.* Snodgrass agreed that Hasan's various orders to beat inmates included orders not to cause any permanent injury. *Id.* The idea to kill a guard was one that came up at every meeting, and at the April 15 meeting, Hasan said, "Let's vote," whereupon those present voted either verbally or by raising his hand. *Id.* at PageID 10319, 10334, 10336. Robb and Hasan were negotiators for their respective groups in the face-to-face negotiation meetings near the end of the riot. *Id.* at PageID 10346-47.

### Inmate David Lomache

Inmate David Lomache also testified that Hasan was the leader of the Muslims. (ECF No. 163-10, PageID 10938.) On cross-examination, however, it was brought out that in a June 1993 interview, he had stated that an inmate named Roper was the leader of the Muslims and was responsible for starting the riot. (ECF No. 164-1, PageID 11065.) Lomache was present at the meeting during which killing a guard was a topic, claiming he was asked to join those present to discuss the list of demands the inmates were creating. *Id.* at PageID 10984, 10986. He stated the participants in that meeting included Hasan. *Id.* at PageID 10987. The inmates talked about the Unwin statement, how they did not feel they were being taken seriously, and they discussed the selection of a hostage to kill so as to establish their seriousness to those outside the prison. *Id.* at PageID 10988. Further discussion was had concerning who would carry out the killing and it was decided that it would be the Black Gangster Disciples. *Id.* at PageID 10989. Lomache testified that no one in the meeting was opposed to killing the guard, and that all present, some twenty or thirty inmates, were in favor of doing so. (ECF No. 163-10, PageID 10989, ECF No. 164-1, PageID 11025, 11042.)

**Inmate Stacey Gordon**

Stacey Gordon testified that through conversations with Hasan and inmate Cummings, he first became aware of a plan to "take over" the prison about forty days prior to the riot's beginning on April 11, 1993. *Id*. at PageID 11119-20. There were at least three meetings in the prison library between Hasan, inmate Cummings, and Gordon, among others, prior to the riot. (ECF No. 164-1, PageID 11216.) On April 9 he learned that the date of the "take over" was in two days and that the location was going to be on the L side of the prison. *Id*. at PageID 11122. Sure enough, on the appointed day, he met with Hasan in the recreation yard and was instructed to tell certain inmates of the plan to take over the prison, specifically those inmates who had weight bars, bats, and other instruments that could be used as weapons. *Id*. at PageID 11123. He collected the equipment at Hasan's direction and also gave Fryman and another inmate cigarettes[11] in exchange for weapons Fryman had crafted, commonly called shivs or shanks in prisons. *Id*. Fryman never returned with the weapons, and Hasan went inside to get them halfway through the recreation period. *Id*. at PageID 11220.

When recreation time was over and Gordon was inside, Hasan gave him a shank and then approached CO Horsley and took his walkie-talkie. *Id*. at PageID 11125-27. Gordon testified that Hasan ordered him to kill Fryman because Fryman had not returned to the recreation yard and given the knives to Hasan. *Id*. at PageID 11129-31. Hasan participated in the attack on Fryman, stabbing him in his neck and right side. *Id*. at PageID 11133. Hasan ordered the snitches to be locked up, ordered Gordon to kill the correctional officer he was guarding if law enforcement stormed the prison, and ordered that no one was to enter the L-6 block without Hasan's or Gordon's approval. *Id*. at PageID 11136, 11140-41. Gordon testified that Hasan had

---

[11] Cigarettes function as currency in prison.

the snitches locked up for their own protection, but also acknowledged that it could have been so that the snitches could be killed. *Id*. at PageID 11224-25. On the third day of the riot, Gordon heard Hasan ask which officer should be killed if it came to that, and he and Hasan along with another inmate discussed the matter. *Id*. at PageID 11150-51. Upon hearing that CO Vallandingham had been killed, Hasan uttered an Arabic phrase that meant, "All praise be to God." *Id*. at PageID 11150.

Hasan also ordered inmate Bruce Harris locked up for raping an inmate at the outset of the riot, and decreed that his first punishment should be that he be beaten for five minutes, which was carried out. *Id*. at PageID 11153-54. Later, he heard Hasan say that Harris would be killed if he didn't stop disrupting the Muslim prayers. *Id*. at PageID 11243. Gordon placed Hasan at the scene of Harris' murder and described the killing in some detail including Hasan's urging the inmates to kill Harris and make sure he was dead. (ECF No. 164-1, PageID 11160-65.) Gordon corroborated Roger Snodgrass' testimony that Hasan ordered those plotting against him to be locked up, and that he released those plotters who had converted to Islam while locked up. *Id*. at PageID 11156.

### Inmate Anthony Lavelle

Inmate Anthony Lavelle described a meeting that took place prior to the riot between the leaders of the Muslims, Black Gangster Disciples, and Aryan Brotherhood in which it was agreed that they should stop fighting each other and work together to address their problems with the prison administration. (ECF No. 164-2, PageID 11286-88.) On April 11, 1993, after sensing that something was going on in the yard, Lavelle went outside where he encountered Stacey Gordon who told him, "We're going to take over this bitch." *Id*. at PageID 11295. Sometime

later that same day, he was in the L-block looking for fellow Black Gangster Disciples when Hasan said he wanted to show Lavelle something and led him to the showers where the CO hostages were being held. *Id*. at PageID 1101-3. While the two men "toured" the L-6 block, they saw four or five inmates, some who were dead, and others who were not. Hasan quoted the Qur'an and suggested the still-living men be put out of their misery, but after Lavelle suggested all of those men be put out on the yard, Hasan agreed and it was done by some Muslims. (ECF 164-2, PageID 11306-7.)

Lavelle stated there were daily meetings between the inmate leaders and that decisions were made by the group not by voting, but by implementing suggestions unless there were objections to them. *Id*. at PageID 11321-24. A few days into the riot, some of the inmate leaders were becoming impatient with the lack of progress on having their demands met, and the idea of killing a correctional officer was discussed. *Id*. at PageID 11329. Present at that time were Hasan, Robb, Snodgrass, Bocook, Cummings, Allen, Jefferson, and a few other inmates. *Id*. The details of who would be selected to do the killing and who was to be killed were not discussed at that time. *Id*. at PageID 11330.

After that meeting, Lavelle said he and Hasan discussed the matter separately for fifteen or twenty minutes. *Id*. at PageID 11440. Lavelle said Hasan began crying and protesting that "he don't want the responsibility," but Lavelle told him, "Well, you have the responsibility, you know. This is your thing." *Id*. at PageID 11331. Hasan ultimately decided that it was best to hold off killing the guard, but later that day the Tess Unwin statement was broadcast and the inmates reacted by deciding without dissent that if their demand to have the power turned back on in the institution was not met by a certain time, they would kill a guard. (ECF 164-2, PageID 11332-33.) Lavelle claimed that neither he nor Hasan was very upset about the Unwin

statement, but other inmates were. *Id*. at PageID 11464-65. It was agreed that one inmate from each of the three groups would participate in killing the guard. *Id*. at PageID 11334. Hasan left the selection of a Muslim to assist in the killing to his security team. *Id*. at PageID 11469. Lavelle left the meeting area for a couple of hours until the deadline for meeting the inmates' demand had passed, and when he returned, he learned that a guard had been killed and put out on the yard already. *Id*. at PageID 11335-37.

Lavelle, Hasan, and Robb were the negotiators after attorney Nicky Schwartz became involved in the negotiations to end the riot. *Id*. at PageID 11360-61. Those three inmates were also involved in the mechanics of the surrender, collecting inmates' names, bringing the injured inmates out first, and sending out twenty inmates at a time for processing. (ECF No. 164-2, PageID 11363, 11366.)

On cross-examination, Lavelle acknowledged that he agreed to testify against Hasan because the prosecutors threatened to charge him capitally if he did not. *Id*. at PageID 11382. The deal he struck was that he would testify in all cases the State wanted him to and in return he would be given a 7- to 25-year sentence to run concurrently with his existing 3- to 15-year sentence, and that after his testimony in the cases, he would be moved out of the State of Ohio. *Id*. at PageID 11499. He also stated that although he testified in George Skatzes' trial that the voices of Were, Allen, Elmore, and Cummings carried equal weight to Hasan's among the Muslims, the truth is that Hasan had the final word. *Id*. at PageID 11403-6. Prior to Hasan's trial, Lavelle had testified in the capital trials of Were, Skatzes, and Robb. *Id*. at PageID 11407. Lavelle said Hasan never suggested killing a correctional officer, but when he, Robb, and Lavelle remained silent when the suggestion to kill a guard was made, it was obvious that it could and would happen. *Id*. at PageID 11421-22, 11429.

**Inmate Stanley Cummings**

Stanley Cummings testified in Hasan's defense. (ECF No. 164-5, PageID 12194 *et seq*.) He stated that Hasan instructed him to help other Muslims, that he and Hasan were most active in preventing violence and maintaining peace during the riot, and that neither he nor Hasan discussed the idea of threatening to kill a correctional officer, except perhaps to consider the ethics of such an act. (ECF No. 164-5, PageID 12211-12, 12232, 12241-42.) Hasan, Cummings, and other Muslims had a meeting to try to determine who had sanctioned and carried out Vallandingham's murder, which was against Islamic law. *Id*. at PageID 12251. At that time, Hasan was upset and emotional because someone had sabotaged the negotiations by killing Vallandingham. *Id*. at PageID 12252. Cummings testified that their Muslim faith required him and Hasan to keep the hostages safe and to expose them to Islam. *Id*. at PageID 12244. On cross-examination, Cummings acknowledged that he pleaded guilty to conspiracy to commit the aggravated murder of Vallandingham even though he also claimed to have no involvement in the murder. *Id*. at PageID 12268.


**Siddique Abdullah Hasan, fka Carlos Sanders**

Hasan himself took the witness stand in his own defense and denied any role in planning the riot or precipitating it, denied telling correctional officers at the crash gate that he was in charge of the riot, said he encouraged others to lock suspected snitches up rather than kill them, and denied taking part in any meetings between the leaders of the prison groups until after Vallandingham's murder on April 15. (ECF No. 165-4, PageID 13334-46, 13383, 13385, 12464, 12468, 12532, 12548.) Hasan further testified that he went to meetings after the killing to try to

"get the situation resolved." *Id*. at PageID 12469. He denied ever being a chief negotiator for the inmates, but did participate in the negotiations with Nicky Schwartz on the last day of the riot. *Id*. at PageID 12475. Hasan stated that he prevented the killings of the inmates who were believed to have concocted a plot to overthrow the inmate leadership during the riot. *Id*. at PageID 12508-12.

### Attorney Niki Schwartz

Niki Schwartz is a Cleveland attorney who was called in to act as a negotiation facilitator between the inmates and the authorities. He testified that Jason Robb was the main inmate negotiator at the time he became involved in events taking place at the prison but that Lavelle and Hasan were also present during the negotiations. (ECF No. 165-2, PageID 13177, 13179.) Schwartz characterized Hasan as "a peacemaker" during his dealings with him, and testified that Hasan was concerned about the safety of the correctional officers held as hostages and the inmates' property. *Id*. at PageID 13180-81, 13212. Schwartz credited Hasan with facilitating and expediting the surrender process, and said that he saw no indication Hasan was in complete control of the other inmates or that he sought to prolong the riot. *Id*. at PageID 13183, 13193. He acknowledged on cross-examination that at the time, he took everything the inmate negotiators told him on faith, and that he later found that virtually everything they told him was true. *Id*. at PageID 13199-13200.

### Evidence Submitted in State Post-Conviction Proceedings

Hasan also cites evidence submitted in support of his state post-conviction petitions which he contends would have weakened the State's case against him, specifically the State's

contention that he organized and was in charge of the riot. (ECF No. 185, PageID 13879-85.) To that end, he submitted the affidavit of inmate James Bell, in which Bell stated that when the riot began, he himself assumed a leadership role. (ECF No. 160-2, PageID 6222.) He claimed that an attempt was made to coerce him into testifying against Hasan, that he resisted, and that he gave that information to Hasan's attorneys but was never called to testify in Hasan's case. *Id.*

Inmate Reginald Williams submitted an affidavit that contradicted his trial testimony. He described the power structure among the Muslims in the prison as "majority rule," even if Hasan disagreed and stated that Hasan could not make another Muslim do anything the Muslim did not want to do. (ECF No. 160-2, PageID 6239-41.) Sometimes, Muslims did things Hasan did not want them to do. *Id.* at PageID 6239. Williams credits Hasan with the decision to treat the correctional officers with respect, and with saving lives during the riot. *Id.* He stated that he spent half or a little more of the time during the eleven-day riot with Hasan and never heard him state a desire to kill a corrections officer. *Id.*

Inmate Leroy Elmore also submitted an affidavit in which he stated that no Muslim could make any other Muslim do anything, apparently intending to counter the State's theory at trial that Hasan ordered a Muslim follower to participate in Vallandingham's murder. *Id.* at PageID 6224.

Hasan repeatedly states, without citation to the record, that Kenneth Law recanted his trial testimony implicating Hasan in Vallandingham's murder. (ECF No. 185, PageID 13849, 13871, 13889, 13892, 13894, 13897, 13903, 13907, 13910.) Though this Court is under no obligation to search the extraordinarily voluminous record in this case for evidence supporting Hasan's allegation, it did find two sworn affidavits by Law that were appended to Hasan's post-

conviction petition.  (ECF Nos. 84-15, PageID 1170-72, and 84-16, PageID 1256-59.[12])  In the

first, dated March 9, 2000, Law gives a convoluted account of a plan he and inmate Sims hatched

to regain their freedom by providing law enforcement with information about the Vallandingham

murder, and they concocted a story the details of which are not elaborated upon in the affidavit.

*Id*. at PageID 1170.  In an apparent attack of conscience, Law states he decided to abandon the

plan because "someone may die for something they did not do."  *Id*. at PageID 1171.  Amid

prosecutors' threats of being charged with Vallandingham's murder, offers of a plea deal, and

alleged leaks by prosecutors of false stories to the media about Law's being a witness in another

case, Law relented and agreed to testify against Hasan and Were.  *Id*. at PageID 1172.

In Law's second affidavit, sworn on September 19, 2003, in connection with George

Skatzes' case,[13] he tells a different story.  He first professes to wanting to clear his conscience

about "the injustice" he was "forced to participate in" to save himself from being tried,

convicted, and possibly executed for a crime he did not commit, that being the murder of

Vallandingham.  (ECF No. 84-16, PageID 1256.)  Law states that he overheard three inmates,

Anthony Lavelle, Aaron Jefferson, Tim Williams, and two other unnamed inmates discussing

killing a guard.  *Id*.  The two unnamed inmates were masked and exited the L-6 block just before

Law entered, whereupon Law saw Lavelle there, then saw Vallandingham's body in the L-6

shower.  *Id*.  It was clear to him that Lavelle and the other inmates had killed Vallandingham.  *Id*.

at PageID 1257.  Law stated without elaboration that he could see that the Muslims, including

Hasan, were not in agreement with what Lavelle and his cohorts had done.  *Id*.  Law claimed the

investigators and prosecutors threatened him with the death penalty for Vallandingham's murder

if he did not testify that Hasan ordered the killing.  *Id*.  He told them that Lavelle killed

---

[12] The PageID numbers in ECF No. 84 and its eighteen exhibits are inexplicably not in sequential order.
[13] Only those parts of Law's affidavit relevant to Hasan are summarized here.

Vallandingham, but the prosecutor continued to threaten him and spread a rumor that Law had cooperated with the investigation, causing him to fear for his life. *Id.* at PageID 1258. Law averred that he was coached on what to say before his false statement was recorded, and that he testified falsely in court. *Id.* at PageID 1259.

Hasan also submitted a report of a polygraph test on Kenneth Law in which the officer who administered the test concluded that Law was not being completely truthful when he denied having a direct role in Vallandingham's murder and when he stated that he had seen two other inmates kill the guard. (EFC No. 160-2, PageID 6256-57.) The report includes a statement that "[i]t is significant to note that a statement from inmate Sherman Simms [sic] accuses Kenneth R. Law of being personally involved in the murder of Officer Vallandingham." *Id.* at PageID 6256.

Inmate Thomas Mack averred that Hasan did not lead the Muslims in the prison, and that he was just the prayer leader. *Id.* at PageID 6226. He stated that after the riot, Hasan was upset that the guards were not kept safe during the riot and that Vallandingham was murdered. *Id.*

Greg Durkin, also an inmate, stated in his affidavit that the Muslims and Aryan Brotherhood tried to get the riot under control and that Hasan wanted the riot to end and tried to bring about peace. *Id.* at PageID 6228. He never heard Hasan talk about killing a guard, but he did overhear Anthony Lavelle comment that he'd "taken care of business" shortly before Durkin heard that Vallandingham had been killed. *Id.* at PageID 6229. Durkin averred that Lavelle was angry after the Unwin statement and that Lavelle boasted he had shown Unwin he wasn't joking about killing a guard. *Id.*

Inmate Brian Eskridge also swore an affidavit. He stated that no one was directing the riot at the outset, but that all the inmates wanted to participate. (EFC No. 160-2, PageID 6230-31.) Lavelle told Eskridge that a vote was taken on whether to kill a guard and that the Black

Gangster Disciples were going to "take care of business." *Id*. at PageID 6231. Eskridge said that because he refused to take part in killing Vallandingham, he was beaten. *Id*.

Inmate Wayne Flannigan stated in his affidavit that Hasan did everything he could to keep the correctional officers and other inmates safe during the riot, and credited Hasan with saving many lives. *Id*. at PageID 6233. Flannigan never heard Hasan discuss killing a guard, but he did hear Lavelle tell another inmate he had some business for the inmate to take care of, which he interpreted as being an order to kill a guard. *Id*. Kenneth Law told Flannigan that he was going to put the blame for killing Vallandingham on Hasan. *Id*.

Aaron Jefferson, an inmate, averred that Lavelle was the first person to suggest killing a correctional officer, and that he never heard Hasan discuss the matter. *Id*. at PageID 6235. Jefferson said Lavelle wanted him to kill a guard, but he refused, although he did participate in beating Brian Eskridge on Lavelle's order. *Id*. at PageID 6236. Jefferson denied seeing Hasan in the meeting at which the idea of killing a guard was discussed. *Id*. Later, after the riot ended, he received a letter from Lavelle in which Lavelle wrote that he had shown Jefferson "how to get the job done and how to get away with it," which Jefferson believed to be about killing Vallandingham. *Id*.

Inmate Daniel Poole stated in his affidavit that on the second day of the riot a meeting was held among the leaders of the three main groups to try to obtain some control over the chaos inside the riot zone. (ECF No. 160-2, PageID 6237.) The two leaders of the Muslims at that time were Leroy Elmore and James Were. *Id*. "To the best of [Poole's] knowledge," Hasan did not attend the inmate meeting that took place soon after the Unwin statement came to the attention of the inmates. *Id*. at PageID 6238.

In his affidavit, inmate Anthony Byrd also credited Hasan with saving lives during the

riot by locking people up for their own protection, including Byrd himself.  *Id*. at PageID 6242.
He never heard Hasan give any orders, although he admits to having been locked up the entire
time of the riot.  *Id*.  On the day of Vallandingham's murder, Byrd saw two masked inmates
enter the cell in which CO Hensley was being held and then, joined by inmate Were and in
possession of a cord, the men took Hensley to a cell downstairs.  *Id*. at PageID 6242-43.  Byrd
could not see what went on in the cell, but later that morning, a body was removed from that cell.
*Id*. at PageID 6243.

Inmate Michael Trocodaro was a friend of Hasan's in prison.  *Id*. at PageID 6244.  He
described Hasan's position among the Muslims as one of "just a figure head," and stated that
inmate Leroy Elmore outranked Hasan in the hierarchy of Muslims.  (ECF No. 160-2, PageID
6244.)  Trocodaro was locked up by Elmore during the riot, but overheard Elmore and Hasan
disagreeing about whether all inmates should be fed, as Hasan desired, or that only Muslims
would be fed, which was what Elmore wanted.  *Id*. at PageID 6245.  Elmore said, "I run this . . .
anyone who doesn't like it has to deal with me because I run this."  *Id*.  Trocodaro credits Hasan
with keeping many of the correctional officers safe during the riot.  *Id*.

Inmate Roy Donald averred that from what he observed during the riot, there was no one
person in charge, and that Hasan had been able to prevent some killings.  *Id*. at PageID 6247.  He
further detailed the comings and goings from the L-6 block, including inmates Were, Lavelle,
Gordon, and Law, and stated that he saw two masked inmates drag a body wrapped in sheets out
of L-6 and toward the gym.  *Id*.  Donald said that Lavelle later told him he "took care of
business" by having CO Hensley kill Vallandingham, but Donald did not believe Lavelle.  *Id*.  It
wasn't until the next day that Donald learned that a correctional officer had indeed been killed.
*Id*.

There are also excerpts from transcripts of some of the other Lucasville defendants' trials appended to Hasan's post-conviction petition including an excerpt from David Lomache's testimony in an unidentified defendant's trial in which Lomache stated that he believed Hasan was present for a few minutes in a meeting during the riot. *Id*. at PageID 6266-67. No date is provided for the meeting, nor is any topic that may have been discussed at the meeting revealed in the excerpt.

Another excerpt is from George Skatzes' trial and has an unidentified witness testifying that Hasan may or may not have been present at a meeting after the Unwin statement was broadcast. *Id*. at PageID 6269-71. Also from Skatzes' trial is an excerpt in which an unidentified inmate explained the power hierarchy during the riot and how decisions were made. *Id*. at PageID 6272-74. There, the inmate indicated that leadership of the Muslims during the riot was by a collective body comprising Hasan and several other Muslims. *Id*. He further stated that a vote was taken on whether to kill a guard. Consistent with the inmates' decision-making method, a proposal was made to kill a guard if the inmates' demands were not met, and as no one objected the measure was agreed upon. *Id*. Hasan was present at that meeting. *Id*. Stacey Gordon also testified at Skatzes' trial, stating that he, Hasan, and inmate Cummings discussed which guard should be killed. *Id*. at PageID 6281-83.

The next excerpt is from Jason Robb's trial. In it, an unidentified inmate stated that a meeting was held to discuss killing a guard and that Hasan was becoming less vocal at that time as inmates Were and Allen were becoming more so. (ECF No. 160-2, PageID 6276-77.) Another unidentified inmate testified in Robb's trial that Anthony Lavelle told him the Muslims and Aryan Brotherhood wanted to "protect these damn polices" and snitches, but that the Black Gangster Disciples disagreed. (ECF No. 160-2, PageID 6303.)

In an excerpt from James Were's trial, Sherman Sims testified that he saw Were standing outside the shower area looking in at two inmates, Laws[14] and Jones, strangling someone. *Id.* at PageID 6632, 6634-37.)  Immediately after naming the two inmates involved in the killing, Sims identified inmates Jones' and Kenneth Law's photographs. *Id.* at PageID 6637; *Were v. Warden*, Case No. 1:10-cv-698, ECF No. 114-3, PageID 19723-25.  Also from Were's trial, an unnamed inmate stated that George Skatzes and Jason Robb were running the riot from the beginning, and that although the Muslims had "a lot of say," they did not run the riot.  (ECF No. 160-3 at PageID 6655, 6657.)

### Evidence Submitted With Hasan's Pro Se Application to Reopen his Direct Appeal

In June 1998, Hasan moved *pro se* to reopen his direct appeal alleging his appellate counsel were ineffective.  (EFC No. 161-2, PageID 7315.)  Relevant to his claim of actual innocence here, Hasan attached portions of his trial transcript which is not new evidence and which has already been summarized, *supra*.  (ECF No. 161-2, PageID 7346-78.)  Other submissions with Hasan's application to reopen his direct appeal have no bearing on his current claim of actual innocence.

### "NEWLY TURNED OVER EVIDENCE"

Appended to his previous motion to amend, etc. (ECF No. 166) are documents Hasan asserts were obtained in the course of these habeas proceedings.  He directs the Court's attention to a note he contends was written by inmate Edward Thornton in which the inmate indicates that an unidentified inmate other than Hasan (the inmate calls Hasan "Sanders") was "calling the

---

[14] As explained *infra* at Footnote 15, along with Kenneth Law, there was an inmate by the name of Robert Laws at Lucasville at the time of the riot.

shots" during the riot.  (ECF No. 166-3, PageID 13617, 13673.)  There is no signature on the note, nor is there any identifying information or date contained within it.  Hasan also cites to a continuing case investigation report dated November 19, 1993, in which inmate Thornton identified Stanley Cummings as a person who was giving orders during the riot.  *Id*. at PageID 13617, 13681.  Another continuing case investigation report, dated May 20, 1993, indicates that inmate Anthony Henderson identified James Were as a "key man and Muslim leader" during the riot.  (ECF No. 166-3, PageID 13666.)  Two continuing case investigation reports, both dated January 26, 1993, reveal that Reginald Williams stated Keith Lamar asked Cecil Allen for permission to kill the inmates alleged to be snitches, and that Allen gave Lamar permission to do so, which Hasan contends demonstrates that Allen was in charge during the riot.  *Id*. at PageID 13617-18, 13696-97.

Next, Hasan points to what is apparently an excerpt from an interview with an inmate he states is Matthew Mason, although no name or date of the interview appears on the excerpt document.  *Id*. at PageID 13617, 13690-91.  The inmate described how he was looking for the leader of the Muslims, and that he ultimately went to see "this Thumelar (phonetic), Thumlar (phonetic) ten or twelve different ways to pronounce it, I'm sure you know who I'm talkin['] about by now," which Hasan says establishes that Leroy Elmore was the Muslim leader.  *Id*.  In another document Hasan contends is an excerpt from Mason's interview, the inmate identified Anthony Lavelle as having claimed to be running the riot.  (ECF No. 166-3, PageID 13665.)

In another inmate statement without a name or date, the interviewee said an inmate who went by the name "Lucky" was "the number one guy in this, you know, Lucky's War."  (ECF No. 166-3, PageID 13669.)  Hasan tells the Court the interviewee was David Lomache.

Hasan contends that the State did not consider him to be the person at the top of the

Muslim hierarchy in the months after the riot, as evidenced by a chart purporting to illustrate the Muslim leadership. (ECF No. 185, PageID 13891.) He states that the chart placed Hasan in the second-in-command spot in the hierarchy along with Leonard Elmore, with no one's name in the top position. *Id*. The Court observes, however, that both Hasan and Elmore are identified as "POSSIBLE IMAM" on the chart suggesting that the authorities simply weren't certain which of them was the Imam as of July 14, 1993, the date appearing on the chart.

Hasan states that inmate Timothy Williams overheard Kenneth Law discussing the murder of Vallandingham with two other inmates, referencing a Continuing Case Investigation Report. (ECF No. 166-3, PageID 13621, 13674.) That document, however, clearly states the inmate Williams overheard was Robert Laws, not Kenneth Law.[15] The Magistrate Judge chooses to believe that this misstatement by Hasan's counsel is indicative of nothing more than carelessness, but it is in any case inexcusable. Suffice it to say that that particular investigative report fails to support Hasan's allegation that he is actually innocent.

There are a couple of pages of transcript of a law enforcement interview with Sherman Sims attached to Hasan's motion that were discovered among the boxes of documents related to the prosecution of Jason Robb. Hasan insists that evidence consisting of inmate Sims' statements describing Vallandingham's murder and identifying Kenneth Law as one of the killers would have "put the lie" to Law's trial testimony identifying two other inmates as the

---

[15] The Court considered the possibility that the first name and the "s" added to the last name of Robert Laws could be a simple mistake by the prisoner or officer writing the report, but there was an inmate by the name of Robert Laws at Lucasville during the riot, as evidenced by inmate Kenneth Hazlett's identification of him at George Skatzes' trial. *See Skatzes v. Warden*, Case No. 3:09-cv-289, ECF No. 74-7, PageID 4768, where Hazlett testified that State's Exhibit B-16 was a photograph of Robert "Peanut" Laws. Although an arguably less reliable a source, a simple Google search of the internet reveals that Robert Laws, Inmate Number A135587, with a date of birth of May 28, 1946, was incarcerated in Ohio at the time of the riot. *See* http://bailbondcity.com/ohio/ohdoc-inmate-LAWS/A135587, last visited February 13, 2018. The name, inmate number, and date of birth all match the information on the investigation report appended to Hasan's Motion. Mr. Laws died on June 24, 2014. http://www.legacy.com/obituaries/dispatch/obituary.aspx?page=lifestory_&pid=171672122, last visited November 28, 2017, but on January 4, 2018, was discovered to be a dead link.

correctional officer's murderers.  (ECF Nos. 185, PageID 13894-96; ECF No. 166-3, PageID 13718-19, 13727-28.)  In his argument he refers to Sims' polygraph examination which he states indicated that Sims was substantially truthful when he said Law was one of Vallandingham's killers.  In addition, there is a continuing case investigation report appended to the predecessor of the instant motion that reflects Simms' identification of Law as one of Vallandingham's killers. (ECF 166-3, PageID 13707.)

Hasan asserts that inmate Wayne Flannigan said Kenneth Law confided to him that Law was planning to place responsibility for Vallandingham's murder on Hasan, but provides no citation to anything in the record for that proposition.[16]  (ECF No. 185, PageID 13896.)  Hasan does provide a citation to the record for his contention that Stacey Gordon told law enforcement that Law told him that Law and inmate Alvin Jones killed Vallandingham after being directed to do so by James Were, and that Law told Gordon he was going to try to shift blame for the killing to someone other than himself.  (ECF No. 185, PageID 13897; ECF No. 166-3, PageID 13720.)

In a polygraph examination, Kenneth Law stated that he witnessed Vallandingham's murder, naming inmates Jones and Alexander as the actual killers just as he had testified at Hasan's trial.  (ECF No. 160-2, PageID 6256-58; ECF Nos. 163-6, PageID 10037-40.)  The polygraph examiner concluded that Law's answers to questions relating to the identity of the men who murdered Vallandingham indicated a deliberate attempt at deception.  (ECF No. 160-2, PageID 6257.)  Hasan also cites the results of a polygraph examination administered to inmate Sims, who identified Law, one of the state's main witnesses against Hasan at trial, and inmate Jones as the men who choked Vallandingham to death under the supervision of Were. (ECF 185, PageID 13896.)  He further points to the transcript of an interview conducted of Sims in which

---

[16] The Court came across Flannigan's statement, however, in summarizing his affidavit submitted with Hasan's state post-conviction petition.  (See ECF No. 160-2, PageID 6233.)

the name of the second actual killer was left blank, suggesting that Law was that person. *Id.* Finally, he states that the results of Sims' polygraph examination indicated that Sims was telling the truth when he named Law as one of Vallandingham's killers. *Id.*

**Evaluation of All Evidence**

Although Hasan directs the Court to inmate testimony, interviews, polygraph examination results, affidavits, and other materials which, assuming they are credible, might suggest that he was neither the leader of the Muslims during the riot nor the actual hands-on killer of CO Vallandingham, neither of those facts are necessary elements of the crimes of which he was convicted. Both of those allegations could be true without casting doubt on Hasan's convictions and sentence. Neither the identity of the Muslim leader nor the identity of the person "in charge" of the riot are elements of the offenses of which Hasan was convicted even though such information may have been part of the prosecution's theory of the case at trial. They have no relevance to his claim of actual innocence. Moreover, there is ample evidence in the record from which one could reasonably conclude that Hasan was indeed the leader of the Muslim group before and during the riot.

Assuming Hasan correctly identifies Lomache as the inmate naming Lucky Roper as the orchestrator of the riot and the leader of the Muslims, in his testimony at Hasan's trial, Lomache acknowledged that in a 1993 interview he had mistakenly identified Roper as such. (ECF No. 164-1, PageID 11065.) The sworn testimony of a live witness who has been cross-examined is more credible than the transcript of an undated, uncross-examined interview of an unidentified inmate that Hasan presented with his original motion. (ECF No. 166.) It is worth mentioning,

too, that Lomache testified in both Hasan's and George Skatzes' trials that Hasan was the leader of the Muslims at Lucasville. (ECF No. 163-10, PageID 10938; *Skatzes v. Warden*, Case No. 3:09-cv-289, ECF No. 73-18, PageID 16396-97 (S.D. Ohio).)

Hasan also points out that Lomache's testimony on the persons present at the meeting at which the inmate leaders decided to kill a correctional officer was inconsistent between the Lucasville Riot Cases. (ECF No. 185, PageID 13904.) Specifically he argues that Lomache testified in Jason Robb's trial that he was not certain that Hasan was even present for the meeting at which the selection of a victim was decided, which he says is borne out by the fact that Hasan's voice is not heard on a recording of a morning meeting on April 15, 1993. *Id.* Anthony Lavelle's testimony at Hasan's trial places Hasan at the April 15 meeting, however. (ECF 164-2, PageID 11469.)

In addition, very little of the evidence discovered and presented since Hasan's trial detracts from the evidence presented at trial respecting his participation in ordering the killing of a correctional officer. It is worth noting that some of the interview notes submitted to the Court indicate that Hasan had a direct hand in selecting Vallandingham as the correctional officer to be killed. Those notes appear to state that Hasan and Lavelle chose Vallandingham because he was the oldest and most seriously hurt of the hostages. (*See, e.g.*, Whse. Disc., Pages 110, 132.) And as has been stated before, Hasan was never accused of being a hands-on participant in the actual killing of CO Vallandingham, so evidence that he did not is neither here nor there.

As for the reports that Kenneth Law stated his intent to deflect blame for Vallandingham's murder from himself, a statement by one person indicating he intends to place responsibility for an act on another does not necessarily establish that responsibility lies with someone other than the person upon whom the blame was placed. It is not at all uncommon for

one offender to place blame on another when both were involved in the offense. In other words, Law may have been planning to place responsibility for Vallandingham's murder where it belonged, at least in part. The same can be said of Stacey Gordon's statement that Law had admitted to participating in Vallandingham's murder with inmate Alvin Jones, and intended to try to shift blame to someone other than himself. It is entirely possible that Law fulfilled his stated intention when he shifted blame from himself to inmate Alexander. (*See* ECF Nos. 163-6, PageID 10037-40; ECF No. 160-2, PageID 6256-58.) Still, none of that evidence bears on whether Hasan participated in ordering Vallandingham's murder. Furthermore, Law's attempt to shift blame for the actual killing from himself does not also shift responsibility for ordering the killing from anyone else to Hasan.

The affidavits by Kenneth Law do not specify what part or parts of Law's testimony at Hasan's trial he intended to recant, or exactly what part or parts were false. He stated that he was "willing to pay the penalty for perjury against Hasan," but doesn't identify his perjurious testimony.

Hasan likens his claim of actual innocence to that in *Wolfe v. Johnson*, 940 F.Supp2d 280 (E.D. Va. 2010). There, Wolfe had been convicted of capital murder among other crimes on the word of the actual killer, Barber, who claimed to have been hired to commit the murder by Wolfe. After Wolfe's trial, Barber recanted his testimony. Later yet, Wolfe swore two affidavits recanting his recantation of his trial testimony. The court found reason to suspect that Barber might have been coerced into recanting his recantation after allegations surfaced about some "extremely troubling incidents" between another witness and correctional officials after that witness averred that Barber had told him many times that Wolfe was not involved in the murder. The court noted that Barber's initial recantation of his trial testimony had considerable

corroboration in that over several years, Barber had told a variety of people that Wolfe was not involved. In addition, Barber's recantation of his trial testimony contained other indicia of reliability consisting of its detail and consistency with the direct evidence produced at trial. The court stressed that Barber's recantation of his trial testimony was against the interests of himself, his girlfriend, and his friend, whom he had no reason to implicate.

In contrast, neither of Kenneth Law's affidavits recanting his trial testimony implicate him in Vallandingham's murder. And as noted above, there are considerable discrepancies between the two affidavits in the record before the Court. (*Compare* ECF No. 84-15, PageID 1170-72, and 84-16 PageID 1256-59.) As observed in *Hibbler v. Romanowski*, No. 12-15081, 2015 WL 1954477 at *4 (E.D. Mich. Apr. 29, 2015),

> [R]ecanting affidavits . . . are viewed with "extreme suspicion." *Byrd v. Collins*, 209 F.3d 486, 508, n.16 (6th Cir. 2000). Courts "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332. Here, [recanting witness] Avant did not sign the allegedly recanting affidavit until . . . more than twelve years after Petitioner was convicted of this crime and after Avant had incriminated Petitioner to the police and at his own guilty plea hearing. The purported affidavit does not offer any convincing explanation as to why Avant waited more than twelve years to make this statement. Under similar circumstances, courts have found recanting affidavits insufficient to establish innocence. See *McCray v. Vasbinder*, 499 F.3d 568 (6th Cir. 2007) (district court's holding of equitable tolling and grant of habeas relief reversed as reasonable jurors would discount each of the items of new evidence); *Turner v. Romanowski*, 409 Fed. App'x 922 (6th Cir. 2011) (affirming denial of affidavit-based actual innocence claim without evidentiary hearing); *Franklin v. Woods*, No. 09-13466, 2012 WL 5843157, at *9 (E.D. Mich. Nov. 19, 2012) (finding that, where a recanting affidavit was not signed until almost seven years after a habeas petitioner's conviction and where the affidavit "does not offer any convincing explanation why ]the affiant] waited so long to recant his testimony, " the recanting affidavit did not require that the petitioner be granted a new trial).

Hasan's trial took place in early 1996. Law's affidavits were sworn in 2000 and 2003.

"Recantation testimony offered years after trial is viewed with great suspicion." *Thomas v. United States*, Nos. 2:03-cv-02416, 2:98-cr-20100, 2015 WL 5076969 at *180 (W.D. Tenn. Aug. 27, 2015), *aff'd* 849 F.3d 669 (6th Cir. 2017). In *Thomas*, the time between the trial testimony and the recantation[17] was four years, just as it is here between Law's testimony at Hasan's trial and his first affidavit. "[A]ffidavits by witnesses recanting their trial testimony are to be looked upon with extreme suspicion." *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001) (internal quotation marks omitted). The Sixth Circuit has suggested that recanting testimony from an inmate, in particular, may be subject to considerable doubt. "Reasonable jurors . . . could question the credibility of this about face from another inmate and rationally could discount his testimony . . . ." *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007). Law's recantations therefore carry little weight in the Court's evaluation of Hasan's claim of actual innocence. Hasan devotes substantial argument to Lavelle's involvement in Vallandingham's murder. What he does not do is explain how Lavelle's participation in the decision to kill a correctional officer and Lavelle's alleged hands-on killing of the officer exonerates Hasan himself of participation in the decision to kill Vallandingham. Evidence of Lavelle's participation in the decision or the killing does not diminish Hasan's culpability since it was testified to at trial that the decision to kill a correctional officer was one made by an inmate group that included both Hasan and Lavelle.

Hasan also attacks the credibility of David Lomache's trial testimony. (ECF 185, PageID 13903-06.) He argues that Lomache had initially implicated Lavelle in Vallandingham's murder in his statements to investigators, but provides no citation to the record where documentation of Lomache's statement(s) might be found. *Id.* at PageID 13904. Hasan also states that when

---

[17] While the court in *Thomas* expressed skepticism about the authenticity of the recantation evidence, the four-year lapse between the trial and the recantation was nevertheless reason for additional suspicion.

Lomache testified in George Skatzes' trial,[18] he expressed uncertainty as to whether Hasan was present when Vallandingham was chosen from among the hostage correctional officers to be killed. *Id.* That does not contradict Lomache's testimony in Hasan's trial that Hasan participated in the separate decision to kill a correctional officer, however, because the decisions to kill a correctional officer and of which officer to kill were made at different times. Thus, Hasan could have been at one meeting and not the other.

Hasan places significant meaning on the results of some of the inmates' polygraph examinations, which purport to determine that inmates either were or were not truthful during their examinations as proof of one point or another. (ECF No. 185, PageID 13894, 13896, 13906-07.) For instance, he notes that inmate Timothy Williams' polygraph results indicated he had been truthful when he stated that he heard inmates Were and Barnes discussing the murder of Vallandingham. *Id.* at PageID 13894. That information has no bearing on Hasan's convictions, however, since it is neither exculpatory of Hasan nor impeaching of any trial witnesses.

As for the results of the polygraph tests on the other inmates Hasan cites, the Sixth Circuit has repeatedly expressed its "long-held opinion that the results of a polygraph are inherently unreliable." *United States v. Thomas*, 167 F.3d 299, 308 (6th Cir. 1999). *See United States v. Scarborough*, 43 F.3d 1021, 1026 (6th Cir. 1994); *United States v. Rozin*, No. 1:05-cr-139, 2007 WL 2155850 at *2 (S.D. Ohio July 24, 2007). The circuit court also cautions that polygraph results "should be viewed with great skepticism." *United States v. Younes*, 194 Fed.Appx. 302, 315 (6th Cir. 2006), *citing Thomas*, *supra*. The *Thomas* Court also noted "that the Supreme Court in [*United States v.*] *Scheffer*, [523 U.S. 303, 309 (1998)], 'acknowledged

---

[18] In a document submitted with a state post-conviction petition, Hasan mistakenly indicates Lomache's allegedly contradictory testimony was presented in James Were's trial (ECF No. 160-2, PageID 6249).

that there is no consensus in the scientific community that polygraph evidence is reliable.'" *Reed v. Wolfenbarger*, No. 2:10-cv-13263, 2013 WL 757629 at *9, (E.D. Michigan, S.D. Feb. 28, 2013), *citing Thomas*, 167 F.3d at 308, n.8. The reliability of polygraph evidence is generally viewed as questionable. *See Acosta v. Lynch*, 819 F.3d 519, 526 (1st Cir. 2016) (stating [p]olygraph results have long been considered of dubious value); *United States v. Resnick*, 823 F.3d 888, 896 (7th Cir. 2016), *rehearing en banc denied* 835 F.3d 658 (7th Cir. 2016)(observing that "[p]olygraph evidence has faced sharp criticism, largely because of serious doubts about its scientific or probative value"); *United States v. Alvirez*, 831 F.3d 1115, 1125 (9th Cir. 2016) (noting "it is well established that a polygraph examination may not be admitted to prove the veracity of statements made during the examination" due to its unreliability); *United States v. Tenorio*, 809 F.3d 1126, 1130 (10th Cir. 2015)(stating that because of its questionable reliability, polygraph evidence is generally inadmissible when offered as scientific proof of truthfulness); *United States v. Bagola*, 796 F.3d 903, 908 (8th Cir. 2015) (stating there is no consensus that polygraph evidence is reliable). Thus, the polygraph evidence to which Hasan directs this Court is not the reliable "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" contemplated by *Schlup*, 513 U.S. at 324.

In addition, Hasan lists nine inmates who testified against him at his trial and the consideration each received for his testimony. (EFC No. 185, PageID 13909-10.) He contends the consideration given in exchange for their cooperation rendered the testimony of each of the inmate-witnesses suspect. (ECF No. 185, PageID 13909-10.) In each instance, however, he cites to his trial transcript which means evidence of the deals made with the testifying inmates was known to the jurors and is therefore not "new" evidence at all. Undoubtedly, the jurors took into consideration during their deliberations the fact that the testifying inmates were treated more

leniently than they might have been had they refused to testify against Hasan. He argues that the full story on what consideration various inmate witnesses at his trial received in exchange for their testimony would have called into question the credibility of those witnesses. *Id.* at PageID 13910.

In a footnote, Hasan describes deals he contends some inmates received in exchange for their testimony. (ECF No. 185, PageID 13909, fn.23.) He cites as an example two kites sent by inmate Vieira in which Vieira questions whether the deal granting him a transfer to a different correctional facility in exchange for testimony would be honored. (Whse. Disc. at Page 13977.) The problem with that information is that Vieira did not testify in Hasan's case, hence any deal he may have struck with prosecutors would have been completely irrelevant at Hasan's trial.

A second example Hasan cites is a letter to the prosecutor from, as best the Court can tell, an inmate named Piper which describes a deal he was offered. The deal provided that Piper would testify for the prosecution and plead guilty to manslaughter in exchange for a prison sentence of four or five years. (Whse. Disc. at Pages 13962-63.) Piper, like Vieira, never testified at Hasan's trial.

Hasan's final example concerns an investigator's statement to inmate Eric Girdy that "we may stop your release, okay?" when trying to extract information from him. (Whse. Disc. at Page 261.) But Girdy never testified at Hasan's trial, either. Thus, any deals made by Vieira, Piper, or Girdy were and remain irrelevant to Hasan's case. *See* James G. Carr, *A Judge's Guide to Protecting Your Reputation*, 36 Litigation 26, Spring 2010, at 28 (stressing the importance of "[f]ocus[ing] on what matters and will make a difference"). As for the inmates who actually testified at trial, evidence of their plea arrangements was presented to the jury. Consequently, that evidence is not "new" for *Schlup* purposes, and in their deliberations the jurors were able to

consider the deals the inmate-witnesses struck with the prosecutors.

None of the inmates who testified at Hasan's trial were in his company nonstop for the entire eleven days of the riot. Therefore, that they never heard him order the killing of a correctional officer or select Vallandingham for his victim is neither here nor there.

Hasan's submissions in support of his actual innocence claim leave this Court with no more or less confidence in the outcome of his capital trial than before. None of the "new evidence" he has submitted amounts to the "new *reliable* evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial" required by *Schlup*. 513 U.S. at 324 (emphasis added). "Examples of evidence which may establish factual innocence include credible declarations of guilt by another, *see Sawyer v. Whitley*, 505 U.S. 333, 340 (1992), trustworthy eyewitness accounts, *see Schlup*, 513 U.S. 298, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996)." (Opinion and Order, *Ogle v. Mohr*, No. 2:15-cv-776, ECF No. 64, PageID 3599 (S.D. Ohio July 6, 2016)(Sargus, C.J.).) Hasan presents no credible declarations of guilt by another, no eyewitness accounts more trustworthy than those presented by the prosecution at trial, and no scientific or physical evidence of his innocence. It may very well be that a reasonable jurist could view the reliability of the inmate-witnesses' testimony at Hasan's trial as no greater than that of the inmate statements, etc., he submitted in his post-trial state court proceedings, with his original motion, and in the voluminous material discovered in these habeas proceedings. But even if that were the situation here, it would fall short of establishing Hasan's case as a "truly extraordinary" case that would justify opening of the *Schlup* gateway, especially since much of the new evidence consists of polygraphs and recantations, the unreliability of both of which has been discussed above, and mildly impeaching evidence. *House v. Bell*, 547 U.S. 518, 537

(2006), (*quoting Schlup*, 513 U.S. at 327)(internal quotation marks omitted).

> The mere existence of impeaching evidence in support of a claim of actual innocence does not warrant a new trial. *Dell v. Straub*, 194 F.Supp. 2d at 657 (citing *Johnson v. Hofbauer*, 159 F.Supp. 2d 582, 606 (E.D. Mich. 2001)). Further, the United States Court of Appeals for the Sixth Circuit has held that a petitioner's renewed attacks on credibility of trial witnesses do not provide proof of actual innocence. See *In re Byrd*, 269 F.3d 561, 577 (6th Cir. 2001)(citing *Clark v. Lewis*, 1 F.3d 814, 824 (9th Cir. 1993)(allegation that prosecution witness could have been impeached by allegedly withheld evidence did not constitute a credible claim of "actual innocence" sufficient to show that the petitioner was actually innocent of the murder). "The Supreme Court has noted that such 'latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness'] account of petitioner's actions.'" *Clark v. Lewis*, 1 F.3d at 824 (citing *Sawyer* [*v Whitley*], 505 U.S. [333,] . . . 349 [(1992)]; *Herrera v. Collins*, 506 U.S. 390, 417-18 (1998)). "[I]mpeachment evidence provides [little] basis for finding a miscarriage of justice." *United States v. Zuno-Arce*, 25 F.Supp. 2d 1087, 1110 (C.D. Cal. 1998) (quoting *Calderon v. Thompson*, 523 U.S. 538, 563 (1998)). "This follows because 'the evidence is a step removed from evidence pertaining to the crime itself.'" *Id.* (citing *Thompson*, at 563).

(Opinion and Order, *Ogle v. Mohr*, No. 2:15-cv-776, ECF No. 64, PageID 3600-01 (S.D. Ohio July 6, 2016)(Sargus, C.J.).)

In arguing that this Court should stay his habeas case and allow him to return to the state court to exhaust his eighth and ninth grounds, Hasan directs the Court to *Cunningham v. Hudson*, 756 F.3d 477 (6th Cir. 2014), in his notice of additional authority (ECF No. 173), arguing that he and the petitioner in that case are similarly situated to the extent that exhaustion of Hasan's eighth and ninth grounds for relief is necessary. Not so. In *Cunningham*, the petitioner discovered post-trial and then presented in his state post-conviction proceedings evidence that one of the trial jurors acquired information about Cunningham through the juror's work colleagues at a social service agency. 756 F.3d at 480. The state court denied Cunningham's

request for discovery and an evidentiary hearing. *Id*. After affirmance on appeal and denial of review in the state supreme court, Cunningham filed his habeas petition which included the juror bias claim. He was granted discovery and obtained affidavits from the relevant jurors, which produced evidence that the suspect juror actually had a relationship with the families of Cunningham's victims and was concerned about facing them should a not-guilty verdict be returned. *Id*. at 480-81. The court found that information was substantively different from the evidence presented in post-conviction, did not find the claim to be plainly meritless, and remanded Cunningham's case to the district court for further proceedings.[19] *Id*. at 486-87.

Here, Hasan's evidence is considerably less reliable than in Cunningham's case, not to mention irrelevant (as with the evidence he presents respecting his lack of leadership of the Muslims, masterminding of the riot, and hands-on participation in Vallandingham's killing), as well as cumulative (as with the evidence of agreements inmate/witnesses against him made with the prosecutor). This Report has already discussed the questionable reliability of polygraph tests and inmate recantations, and the weakness of the impeachment evidence Hasan has submitted. Since Hasan operates under the mistaken belief that his new evidence must be taken as true, he has neither demonstrated nor even argued its reliability. In other words, he does not explain why Inmates A, B, and C's statements offered in support of his claim of actual innocence are more credible than and should therefore be believed over Inmates X, Y, and Z's arguably contrary testimony offered at trial. Instead, he requests that an evidentiary hearing be held so that this Court can determine the credibility of the evidence he would present at the hearing. (ECF No. 185, PageID 13910.) Because Hasan has not tendered new evidence of the quality required by

---

[19] The district court later stayed Cunningham's case and allowed him to return to the state court to litigate his newly discovered *Brady* claim. *Cunningham v. Hudson*, No. 3;06-cv-167, 2014 WL 5341703 (N.D. Ohio Oct. 20, 2014). His petition was denied in the trial court, and the state appellate court affirmed the denial. *State v. Cunningham*, 2016-Ohio-3106, 65 N.D.3d 307 (3rd Dist. Ct. App. 2016). The Ohio Supreme Court declined jurisdiction over Cunningham's appeal on July 5, 2017. https://supremecourt.ohio.gov/clerk/ecms/#/caseinfo/2016/0990.

*Schlup*, it is inappropriate to grant him an evidentiary hearing or expansion of the record to allow the evidence he has submitted.[20]

Hasan requests in the alternative that this Court stay his habeas proceedings to allow him to return to the state court to exhaust his eighth and ninth claims in light of the new evidence he has presented with his Motion. (ECF No. 185, PageID 13921.) In the Report and Recommendations, this Court observed that Hasan either conceded or did not contest Respondent's assertions that his eighth and ninth grounds for relief were procedurally defaulted. (ECF No. 81, PageID 1092, 1095.) Hasan instead argued that the actual innocence gateway paved the way for this Court to excuse the default of both claims, but there, as here, he failed to present evidence of the quality required by *Schlup*. Given this history, and the dubious reliability of the evidence Hasan has tendered with his motion, granting him a stay would be an abuse of this Court's discretion. "[A] district court would abuse its discretion if it were to grant [a petitioner] . . . a stay when his unexhausted claims are plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

Accordingly, Hasan's motion to expand the record, for an evidentiary hearing, and in the alternative for a stay to allow him to return to the state court to litigate his eighth and ninth grounds for relief is **DENIED**.


**Tenth Ground for Relief**

In his tenth ground for relief in his petition, Hasan advanced a bare-bones claim prosecutorial misconduct involving the prosecutors' alleged failure to disclose differences in

---

[20] It bears noting yet again that in the course of these proceedings, Hasan "abandoned his motion for an evidentiary hearing by failing to file a renewed motion within the time allotted by the Court after his initial request was denied without prejudice." (ECF. No. 81, PageID 1094; ECF No. 109; ECF No. 119, PageID 1660-61.) Hasan also had an opportunity to file a motion for this Court to reconsider its denial of his request for an evidentiary hearing and discovery "which is precisely what Petitioner said he would do and then did not do." *Id.*

various witnesses' testimonies in the cases arising out of the prison riot as follows:

> **The trial prosecutors suppressed exculpatory evidence by failing to disclose to trial counsel the change in testimony by numerous inmate witnesses in violation of the Fourteenth Amendment.**
>
> As fully stated in his Eighth and Ninth Habeas Grounds, and incorporated herein, numerous inmates gave either recorded statements, testimony in multiple trials, and recorded polygraph exams. Those same inmates were used by the state to convict Petitioner. Despite the telling differences and changes in testimony as previously noted, the prosecutor never corrected the testimony or notified Petitioner of changes in testimony. The suppressed evidence is material. There is a reasonable probability that had the evidence been disclosed the result of the proceeding would have been different (undermine confidence in the integrity of the verdicts).

(ECF No. 16, PageID 2090-01.)

The state court dismissed Hasan's second post-conviction petition which contained Hasan's *Brady* claim as it failed to conform to the requirements applicable to a second or successive post-conviction petition. (Report and Recommendations, ECF No. 81, PageID 1063.) The Report concluded that Hasan had failed to "fairly present" his claim in his second state post-conviction petition by providing specific allegations and supporting evidence of the prosecutors' alleged misdeeds,[21] and found Hasan's tenth ground procedurally defaulted. *Id.* at PageID 1096. Hasan argues that the actual innocence gateway of *Schlup* should excuse his default, but that argument fails here just as it did with regard to his eighth and ninth grounds for relief, *supra*, and for the same reasons.

In addition, and as pointed out by Respondent (ECF No. 169, PageID 13750), Hasan's tenth ground for relief as described and argued in his current motion bears no relation to the tenth ground advanced in his petition, other than that they both invoke *Brady*. Here, Hasan contends

---

[21] Instead, Hasan made an "expansive statement that all the exhibits attached to the post-conviction petition supported his *Brady* claim." (R&R, ECF No. 81, PageID 1096.)

that the alleged *Brady* violation occurred with regard to what he claims is mitigation evidence; to

wit, witnesses' answers to the following suggested interview questions:

> List the most importance [sic] cause of the disturbance.
>
> How effective are the lines of communication?
>
> Do Institutional policies comply with written policies, and are the policies and procedures followed on weekends and holidays as during the week?
>
> How is staff deployed to manage the population, and how is this deployment changed when there are significant increases or decreases in the population?
>
> What do you think of the practice of inter-racial celling? Was this issue a contributing factor in the disturbance?
>
> Describe the "usual" Sunday Activity? [Sic.]
>
> Describe inmate and staff atmosphere in the week before the incident.
>
> What impact does [sic] cultural differences have on staff/inmate interaction?

(ECF No. 185, PageID 13913.) Hasan's original tenth ground for relief did not allege that any

evidence even remotely similar to the above had been withheld by the prosecutors. He cannot

present a new claim in a motion, particularly at this late date, and in his prayer for relief he

wisely does not request to amend his petition to include this new claim. (ECF No. 185, PageID

13921.) In other words making a claim under *Brady* that certain evidence was withheld does not

entitle a habeas litigant at a later stage of the proceeding to allege different evidence was

withheld as if he were litigating the same claim.

Hasan also argues that he should be granted "additional discovery and/or [to] conduct a

hearing on the *Martinez*/[*Trevino*] question as it relates to [his] *Brady* mitigation claim." (ECF

No. 185, PageID 13917.) In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court held as

follows:

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington,* 466 U.S. 668 (1984). To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Cf. Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue).

566 U.S. at 14 (parallel citations omitted). In *Trevino v. Thaler*, 569 U.S. 413 (2013), the Court held that *Martinez* applies "where . . . [the] state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 429. The Supreme Court has not expanded the holdings of either *Martinez* or *Trevino* to excuse in habeas the procedural default of any claim other than an ineffective assistance of trial counsel claim due to post-conviction counsel's ineffectiveness, and this Court is not permitted to do so under the constraints of the AEDPA. 28 U.S.C. § 2254(d)(1). Thus, Hasan's argument that "[w]hile *Martinez* found possible cause [to excuse a procedural default] from the failure of post-conviction counsel to raise trial counsel's ineffectiveness, the failure to discover and raise other 'bedrock' constitutional claims [such as claims of prosecutorial misconduct] present [sic] similar concerns" (ECF No. 185, PageID 13915) finds no purchase here. The Supreme Court in *Martinez* was careful to restrict its holding to the failure to raise in post-conviction a substantial claim of ineffective assistance of trial counsel and not other constitutional claims.

Accordingly, Hasan's requests to be permitted to expand the record with evidence to support this claim, for an evidentiary hearing to demonstrate cause under *Schlup* or *Martinez* and *Trevino* to excuse his procedural default of the instant claim, and to stay his case to allow him to return to the state court to present this claim there are **DENIED**.


**Proposed New Thirty-Sixth Ground for Relief**

Hasan proposes an amendment to his habeas petition to include a claim that his due process rights were violated when "an arm of the Ohio Supreme Court [Disciplinary Counsel] provided legal advice" to a state prosecutor and that he was not informed of those communications. (ECF No. 185, PageID 13917-18.) Essentially, he argues that the Disciplinary Counsel violated an ethical rule against advisory opinions, and that the court itself was biased against him as a result of the improper communications, in contravention to *Tumey v. Ohio*, 273 U.S. 510 (1927). (ECF No. 185, PageID 13917.) He characterizes the communications as a consultation, and the Disciplinary Counsel's participation as resulting in an advisory opinion, which Hasan alleges was prohibited at the time by Ohio Gov. Bar Rule V addressing the operations of the Disciplinary Counsel. *Id*.

Respondent argues that the communication between the Disciplinary Counsel and the prosecutor was not related in any direct way to Hasan's case, and that any claim of bias on the part of the Ohio Supreme Court is pure speculation. (ECF No. 169, PageID 13758.) In addition, Respondent states that at most, Hasan's proposed new claim involves an "appearance of impropriety," which does not rise to the level of a constitutional violation and therefore is not cognizable in habeas corpus. *Id*. at PageID 13760; *but see Rodriguez v. Copenhaver*, 823 F.3d

1238, 1243 (9th Cir. 2016)(noting that "[T]o perform its high function in the best way, *justice must satisfy the appearance of justice,*" *citing Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 865 n.12 (1988)). Respondent cites *Tumey,* too, for establishing that matters of kinship, personal bias, state policy, and remoteness of interest do not implicate the federal constitution. *Id.* at PageID 13760-61, *citing Tumey*, 273 U.S. at 523.

In support of his proposed claim, Hasan has attached to his initial motion a handwritten note which reads as follows:

> 4/30/93  3:10 p.m.
> Mike Miller called.  He talked with Warren Bettis, Supreme Court Disciplinary Counsel.  Bettis says, "Interview them all.  I'll stand by you 100%, + I'll put it in writing."
> Warren Bettis: [phone number omitted]
>
> 5/3/93 175 S. 3rd St.
> Col.
> Suite 280
> 43215-5134

(ECF No. 166-4, PageID 13731.)  In addition, he attached a typewritten note from "Howie" that states in relevant part:

> Just a short note to update you on what is happening at SOCF.
>
> We have interviewed just over 200 hundred [sic] inmates including those who were contacted by the public defender's office.  After consulting with the prosecutor, our legal people in Cols. and even the Supreme Court it was decided that the public defender was out of line and we would proceed with the interviews.  Of course when an inmate requests an attorney the interview is stopped and will be rescheduled after counsel is present.

*Id.* at PageID 13729.

The *Tumey* Court held that "[e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the

accused denies the latter due process of law." 273 U.S. at 532.

What Hasan does not allege is that *any* justice then on the Ohio Supreme Court was ever aware of the conversation between law enforcement and the court's disciplinary counsel, or that if aware, the conversation was remembered by the time Hasan filed his appeal in that court on September 15, 1998, more than five years after the conversation at issue, or at any time before the Ohio Supreme Court rendered its decision in his case on July 18, 2001. Similarly, there is no evidence that the state supreme court was aware of the complained-of conversation throughout Hasan's post-conviction proceedings, which took place between 1997 and 2003, or during the time he prosecuted his application to reopen his direct appeal. Thus, there is no evidence that "a possible temptation" to the justices could have induced in them to harbor any bias against Hasan at any stage of his state court proceedings. Hasan does not even speculate on what pertinent evidence he might uncover if discovery were granted. "Rule 6(a) of the Rules Governing § 2254 Cases does not "sanction fishing expeditions based on a petitioner's conclusory allegations," *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004), *citing Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997), which is precisely the circumstances in Hasan's case with respect to his proposed thirty-sixth ground for relief.

Furthermore, even if the communication between Ohio Supreme Court disciplinary counsel and law enforcement amounted to a violation of an ethical rule, that is not the equivalent of a due process violation. Ethical violations, particularly where any prejudice to a defendant is entirely fanciful, are best resolved by the state disciplinary authorities. *See Baker Group, L.C. v. Burlington Northern and Santa Fe Ry. Co.*, 451 F.3d 484, 491 (8th Cir. 2006). Thus, Hasan has not demonstrated that his proposed claim is cognizable in habeas corpus.

And if that were not enough, Sergeant Howard Hudson testified at Hasan's trial as

follows:

> Very early on, when the public defender's office entered S.O.C.F. and basically assigned attorneys to every single inmate that was there, the prosecutor, Mr. Piepmeier, made a decision that – and the decision I understand was upheld by the Supreme Court of the state – that those attorneys had no legal standing; all of those inmates weren't under investigation at that time, and those initial contacts were ignored, per Mr. Piepmeier.

(ECF No. 163-10, PageID 10881.) Thus, the claim sought to be raised as a "new" claim based on "newly discovered evidence" is not new at all and is, in fact, procedurally defaulted. The Court recognizes that Sergeant Hudson's statement that the Ohio Supreme Court "upheld" the prosecutor's decision was not factually correct, but the testimony quoted should have alerted Hasan's counsel that some kind of interaction between the supreme court and prosecutor's office had taken place and caused them to inquire further into the matter after Sergeant Hudson's testimony in Hasan's trial.

For the foregoing reasons, Hasan's motion to amend his habeas petition to include his proposed thirty-sixth ground for relief is **DENIED**. Similarly, his requests for an expansion of the record, exploratory discovery, discovery and/or an evidentiary hearing on the *Martinez/Trevino* issue, and to stay his habeas proceedings to allow him to return to the state court to exhaust the proposed claim is also **DENIED**.

## CONCLUSION

Hasan's fourth ground for relief, in which he argues the grand jury that indicted him included some members who were biased against him is both not cognizable in habeas corpus and meritless. As a result, the relief he requests with regard to that ground is **DENIED**. Hasan's

eighth, ninth and tenth grounds for relief remain procedurally defaulted as this Court found them to be in the Report and Recommendations. He has not presented the quality of evidence required by *Schlup* to demonstrate his actual innocence and excuse the default, and as it has not been determined that *Martinez/Trevino* applies in Ohio, his requests for expansion of the record, an evidentiary hearing on *Schlup* and *Martinez/Trevino* issues, or a stay of his habeas case to permit a return to the state court are **DENIED**. Finally, Hasan's proposed thirty-sixth ground for relief does not implicate the federal constitution and is therefore not cognizable in habeas corpus. Consequently, Hasan's requests to expand the record, amend his petition, for exploratory discovery, for discovery and/or an evidentiary hearing on post-conviction counsel's ineffectiveness, for a determination of any state corrective process still available to pursue his claim in state court, or for a stay of these proceedings to allow a return to the state court are all **DENIED**.

February 15, 2018.

s/ *Michael R. Merz*
United States Magistrate Judge